UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

RACHELLE GALLAGHER and
MARK KACHADOURIAN,

                Plaintiffs,

   -against-

THE UNIFIED COURT SYSTEM
OF THE STATE OF NEW YORK and
RICHARD MILLER, II, individually and in
his official capacity,

                Defendants.

**COMPLAINT**

<u>JURY TRIAL DEMANDED</u>

3:18-CV-1476 [TJM/DEP]

Plaintiffs Rachelle Gallagher and Mark Kachadourian, by and through their attorneys,

Dreyer Boyajian LLP, complaining of Defendants THE UNIFIED COURT SYSTEM OF THE

STATE OF NEW YORK and RICHARD MILLER, II, individually and in his official capacity,

allege as follows:

**PRELIMINARY STATEMENT**

1.      From 2015 to the summer of 2017, Plaintiffs Rachelle Gallagher, a secretary, and

Mark Kachadourian, a Court Attorney (collectively, "Plaintiffs"), were forced to live in a state of

constant dread knowing that each day they would be reporting to a working environment

permeated by sexual harassment, discrimination and even threats of physical harm.

Astoundingly, this toxic environment emanated from an elected judge that had sworn to

faithfully administer justice and uphold the Constitution, Broome County Family Court Judge

Richard Miller, II.  Perhaps even more disturbingly, the necessary conditions for this harassment,

discrimination and abuse to take root, survive and thrive were provided through the actions and

inaction of administrators, officials, and judges of the Unified Court System in allowing and

approving of an unofficial policy, custom and practice of suppressing and discouraging complaints of sexual harassment.

2.      The scope, pervasiveness and depravity of Judge Miller's behavior cannot be overstated.   During the subject years, Judge Miller engaged in a myriad of objectively and subjectively offensive and reprehensible acts including, among other things, forcing Plaintiffs to view pornography including a nude photograph of a co-worker, repeatedly demanding that Ms. Gallagher satisfy his sexual needs, subjecting Plaintiffs to graphic and crude descriptions of sexual acts and his sexual desires, directing Ms. Gallagher to engage in sexual acts with an elected official in order to curry political favor, and threatening Plaintiffs both directly and indirectly with death and physical injury if they betrayed him.

3.       In desperation, Plaintiffs reached out on numerous occasions to their supervisor at the Unified Court System ("UCS") beginning in 2015, risking reprisal from Judge Miller and his associates in the process.  Nevertheless, for nearly two and a half years their complaints were in all meaningful respects ignored and suppressed, thus subjecting them to further humiliation, embarrassment, emotional and physical distress.

4.      Even when the State of New York finally took action to investigate Judge Miller – some two and a half years after his harassment and discrimination were first reported – Plaintiffs continued to be subjected to numerous retaliatory acts by UCS and its officers and employees, including having their job responsibilities and work assignments drastically reduced, being forced to work in an environment where they would be subjected to death threats, threats of physical violence, and intimidation tactics by associates of Judge Miller, and being isolated and ignored by coworkers.

5.      Unfortunately, Plaintiffs' ordeal is by no means an aberration.  Despite growing public awareness of the epidemic levels of sex-based harassment and discrimination in our society, UCS has shown an unwillingness to take real-world, practical remedial and prophylactic steps when actual instances of sexual harassment and discrimination are reported.   This has proven to be particularly true when the perpetrators also happen to be judges seated in positions of immense power and public trust.  See also Alexis Marquez v. Douglas Hoffman, The State of New York, et al., 18-cv-07315 (ALC) (S.D.N.Y.) (case currently pending in U.S. District Court, Southern District of New York alleging sexual harassment and discrimination by Acting New York State Supreme Court Justice against former law clerk and failures by State of New York, Unified Court System and officers thereof to prevent and respond to the same); Moriates v. New York State Unified Court System, et al., 2:17-cv-04576-JS-AKT (E.D.N.Y.) (case currently pending in U.S. District Court, Eastern District of New York pertaining to sexual harassment and discrimination by another New York State Supreme Court Justice against another former law clerk and failures by State of New York, Unified Court System and officers thereof to prevent and respond to the same).

## PARTIES

6.      Rachelle Gallagher is a female individual and a resident of the Town of Union, County of Broome, State of New York.

7.      Mark Kachadourian is a male individual and a resident of the Town of Vestal, County of Broome, State of New York.  Mr. Kachadourian is an attorney in good standing duly admitted to practice law in the State of New York in 1985.

8.       The Unified Court System of the State of New York is the judicial branch of the State of New York and is administered by the Office of Court Administration.

9.      Upon information and belief, the Unified Court System employs over 15,000 individuals.

10.     Richard Miller, II ("Judge Miller"), is a judge of the Broome County Family Court elected in 2014 and an employee of the Unified Court System and the State of New York.

11.     Upon information and belief, Judge Miller is a New York domiciliary.

## JURISDICTION

12.     This Court has original jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343.  This Court has supplemental jurisdiction over Plaintiffs' state law causes of action pursuant to 28 U.S.C. § 1367.

13.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to Plaintiffs' claims occurred in the Northern District of New York.

14.     On or about March 13, 2018, Plaintiffs each commenced administrative complaints with the U.S. Equal Employment Opportunity Commission.

15.     On or about September 25, 2018 the U.S. Equal Employment Opportunity Commission issued each of the Plaintiffs a Notice of Right to Sue.

16.     This action is brought within 90 days of Plaintiffs' receipt of said notices.

17.     Plaintiffs have complied with all relevant administrative prerequisites to suit.

## FACTUAL ALLEGATIONS

18.     In 2014, Judge Miller was elected as a judge of the Broome County Family Court for a ten-year term that expires in 2024.

19.     Judge Miller had previously been censured in 2002 for misconduct by the New York State Commission on Judicial Conduct while he was serving as a Justice of the Johnson

City Village Court and Town of Union Town Court.  In censuring Judge Miller, the Commission on Judicial Conduct wrote, among other things, that Judge Miller "showed insensitivity and inattention to his ethical responsibilities[.]"  Judge Miller's "insensitivity and inattention" to ethical standards would continue upon his taking the bench in Broome County Family Court.

20.     Following Judge Miller's election, Mr. Kachadourian and Ms. Gallagher were hired by the Unified Court System ("UCS") and assigned to work in the chambers of Judge Miller beginning in January 2015.

21.     At all relevant times thereafter, Plaintiffs were and are employed by UCS.

## MS. GALLAGHER AND MR. KACHADOURIAN ARE SUBJECTED TO SEVERE AND PERVASIVE SEXUAL HARASSMENT AND A HOSTILE WORK ENVIRONMENT

22.     From January 2015 until approximately June 2017, Plaintiffs were forced to work in close quarters with Judge Miller in his chambers located in the Broome County Family Court in Binghamton, New York.

23.     Almost immediately upon assuming their positions Judge Miller began subjecting Plaintiffs to numerous graphic and derogatory sexual comments.

24.     Throughout 2015, 2016 and until his reassignment in the summer of 2017, Judge Miller frequently commented about his dissatisfaction with the amount of sex he was having in his personal life, threatened that he would "get rid of" Ms. Gallagher if she did not take care of his sexual needs, and complained that Ms. Gallagher was not performing adequately because she was not taking care of his sexual needs.

25.     Judge Miller also regularly stated that if he had a different secretary that she would take care of his sexual needs.

26.     Initially, Plaintiffs were hopeful that Judge Miller's inappropriate comments were isolated occurrences.  However, as 2015 wore on, the severity and frequency of Judge Miller's offensive comments only increased.

27.     Judge Miller routinely ordered Mr. Kachadourian to speak to Ms. Gallagher about satisfying Judge Miller's sexual needs, often within earshot of Ms. Gallagher.  Judge Miller would also point to his genitals in front of Plaintiffs and remark that people need to satisfy his needs.

28.     In December 2016, Judge Miller stated to Plaintiffs that Ms. Gallagher was not satisfying his "needs" and noted that he was 52 years old and had "certain needs" that need to be satisfied that he did not have before.

29.     Judge Miller also subjected Plaintiffs to graphic sexual comments about their UCS co-workers.

30.     In early 2017 Judge Miller stated to Mr. Kachadourian that he would like to "have [a female Family Court attorney] bent over a desk" while having sexual intercourse with her.  He also made numerous other sexually inappropriate comments about other female employees of Broome County Family Court in front of Plaintiffs between 2015 and 2017.

31.     Judge Miller regularly engaged in loud, graphic sexual discussions while in Plaintiffs' presence at work.  Upon information and belief, Judge Miller intentionally conducted these conversations in a loud and blatant manner in order to subject Plaintiffs to the graphic and obscene sexual content of the discussions.

32.     For instance, in or about February 2017, Judge Miller and one of his friends, Ian Doe[1], engaged in a lewd and graphic discussion of Mr. Doe's sexual relations with an employee

---

[1] All references to individuals with the surname "Doe" are fictitious names utilized in order to protect those individuals' privacy.

of the Broome County Family Court, Darlene Doe.   During the conversation Judge Miller discussed various sexual positions, orgasms, and graphic details of Darlene Doe's anatomy.

33.     In other subsequent conversations with Ian Doe, Judge Miller stated that he was going to "get in line" to have sex with Darlene Doe and inquired on at least three occasions if he could "get in on the rotation" to have sex with Darlene Doe.

34.     On another occasion in or about March 2017, Judge Miller invited another of his friends, Paul Doe, into chambers where they engaged in loud, graphic discussions about sex and the female anatomy.

35.     During their conversation, Judge Miller ordered Ms. Gallagher to retrieve Darlene Doe and Judge Miller engaged in a work-related conversation with her.   After Darlene Doe left chambers Judge Miller and Paul Doe began loudly discussing Darlene Doe's breasts in front of Ms. Gallagher.

36.     Judge Miller also shared unsolicited descriptions of sexual acts between Paul Doe and Darlene Doe with Plaintiffs on multiple occasions throughout February, March, and April of 2017.

37.     On one occasion in or about April 2017, Judge Miller called Mr. Kachadourian over to him in chambers and proceeded to show him a naked picture of Darlene Doe that he had on his cell phone.   Judge Miller had also attempted to show Mr. Kachadourian pornographic images on his cellular phone on different occasions in 2015 and 2016.

38.     On another occasion in or about April or May 2017, Judge Miller handed Ms. Gallagher a piece of paper with pictures of fruit on it and directed her to choose the juiciest fruit. When Ms. Gallagher turned the paper over there were three pictures of nude women inside. Judge Miller then laughed hysterically in Ms. Gallagher's face.

39.     In or about April 2016, Judge Miller again stated that Ms. Gallagher was not a "real secretary" because "they do everything" and ordered Mr. Kachadourian to explain to Ms. Gallagher about Judge Miller's "sexual needs" and what real secretaries do.

40.     On or about May 8, 2017, Judge Miller displayed pornographic images which he tricked Ms. Gallagher into viewing.

41.     Judge Miller also attempted to intimidate Ms. Gallagher into performing sexual favors for a State Senator in order to curry political favor with him.

42.     On or about May 16, 2017, Mr. Kachadourian and Judge Miller met with a State Senator during a meeting in Albany, New York.

43.     During their meeting, the State Senator refused to give Judge Miller his cellular phone number, enraging Judge Miller.

44.     During the trip back to chambers, Judge Miller told Mr. Kachadourian that he was going to direct Ms. Gallagher to do sexual favors for the State Senator in order to win the State Senator's approval.

45.     On or about May 18, 2017, Judge Miller advised Ms. Gallagher that she needed to go to Albany to take care of the State Senator's sexual needs and that she needed to "take one for the team."

46.     Ms. Gallagher and Mr. Kachadourian were embarrassed, humiliated, and appalled by Judge Miller's behavior and repeatedly made it clear that his harassment and abuse were not appreciated or welcomed.  However, their efforts went unheeded and the harassment and abuse continued.

## JUDGE MILLER THREATENS MS. GALLAGHER AND MR. KACHADOURIAN WITH DEATH AND PHYSICAL INJURY IN EFFORTS TO SILENCE THEM

47.     Plaintiffs' working environment was also permeated with threats of physical violence from Judge Miller, his friends, and associates.  Upon information and belief, these threats against Plaintiffs were intended to discourage them from reporting his ongoing harassment and abuse.

48.     Judge Miller repeatedly made it clear to Plaintiffs that he could call upon the services of a diverse cast of unsavory friends and associates at any time.  He referred to these friends and associates as the "Johnson City Underground" in an apparent reference to their unlawful and violent tendencies.

49.     At some point after Plaintiffs began working in Judge Miller's chambers in 2015 Judge Miller called Mr. Kachadourian and then placed one such friend, Steven Doe, on the phone.  Steven Doe then informed Mr. Kachadourian that if he ever betrayed Judge Miller Plaintiffs would have to answer to him.

50.     Judge Miller also made threats about using his associates to "keep people in line" or "get things done."  Upon information and belief, these comments were intended to prevent and discourage Plaintiffs from reporting his harassment.

51.     On one occasion, Judge Miller made Mr. Kachadourian listen to a phone recording in which an individual that was apparently indebted to Judge Miller begged Judge Miller not to send one of his associates after him.  Upon information and belief, this act was intended to prevent and discourage Plaintiffs from reporting his harassment.

52.     In or about January 2017, Judge Miller threatened Plaintiffs by stating that he already had cement boots made out in their shoe sizes and that if they ever betrayed him they would be found at the bottom of a river.

53.     On another occasion around January 30, 2017, Judge Miller angrily approached Ms. Gallagher in chambers, threatened that she better watch what she says, and ordered her not to talk to any other court staff.

54.     On or about May 9, 2017, when speaking loudly to his friend, Paul Doe, within earshot of Plaintiffs at work, Judge Miller informed Paul Doe that he had cement boots in Plaintiffs' sizes and that if they ever betrayed him or "the family" they would be found at the bottom of a river.

55.     On May 31, 2017, Judge Miller threatened Plaintiffs while they were working that he would "take them out at the knees" if they betrayed him.

56.     As a result of Judge Miller's abuse, harassment, intimidation, and threats, Plaintiffs ability to complete their work was unreasonably interfered with.

57.     Both Ms. Gallagher and Mr. Kachadourian suffered and continue to suffer from extreme anxiety, stress, and emotional pain and suffering due to Judge Miller's misconduct that adversely impacted their ability to concentrate and complete their daily tasks and work assignments.

58.     Judge Miller further impeded their ability to perform their work by demanding that they ignore their official duties in order to assist him with tasks related to his campaign for future elections, including that of his brother-in-law, and that they accompany him on trips to his private legal office where he continued to work on behalf of private clients in clear violation of judicial ethics rules.

**PLAINTIFFS' REPEATED COMPLAINTS TO UCS ARE MINIMIZED AND IGNORED**

59.     Upon information and belief, Defendants had actual and/or constructive notice of Judge Miller's history of disregarding his ethical and professional responsibilities and propensity for engaging in acts of inappropriate and abusive workplace behavior as early as 2002.

60.     Nevertheless, Plaintiffs were never warned by Defendants of Judge Miller's history of engaging in unethical and unprofessional behavior or of his propensity for engaging in inappropriate workplace behavior before being assigned to Judge Miller's chambers or at any time thereafter.

61.     By December 2015, Plaintiffs had grown so desperate to end Judge Miller's severe and pervasive harassment and abuse that they decided to report his behavior to their superiors notwithstanding his threats of physical harm.

62.     In accordance with the then-effective version of the New York State Unified Court System Sexual Harassment Policy & Procedures (the "Original Sexual Harassment Policy"), Ms. Gallagher approached the then Chief Clerk of the Broome County Family Court (the "Chief Clerk") and made a verbal complaint on behalf of Mr. Kachadourian and herself regarding Judge Miller's sexual harassment and intimidation.

63.     Upon hearing Plaintiffs' complaints, the Chief Clerk attempted to downplay and normalize Judge Miller's actions by explaining that Judge Miller had also previously made sexually charged comments to her, thus intimating that if she could put up with such comments than Plaintiffs should be able to as well.

64.     Between 2015 and June 2017, Plaintiffs complained to the Chief Clerk on at least fifty (50) separate occasions regarding Judge Miller's harassment and abuse.

65.     Upon information and belief, despite Plaintiffs' repeated pleas for assistance, Defendants did not investigate or take any corrective action with respect to Plaintiffs' complaints, nor inform them of their rights under the Original Sexual Harassment Policy.

66.     Defendants' acts and omissions were in stark contravention of the Original Sexual Harassment Policy which provided, among other things, that upon making a verbal harassment complaint to "any supervisor or manager", said person would be provided with a copy of a written complaint form.

67.     Upon information and belief, the failure to initiate any formal complaint procedure or otherwise abide by the Original Sexual Harassment Policy was due to a *de facto* policy, practice and custom by UCS of suppressing complaints of sexual harassment at their source by, among other things, discouraging the filing of formal complaints, minimizing and normalizing the behavior of harassers, withholding information from complainants, and intentionally failing to report acts of harassment.

68.     As a result of this *de facto* policy and the inaction of UCS, Plaintiffs were forced to endure additional harassment and abuse from Judge Miller and suffer the resulting severe emotional distress and associated health effects.

69.     The State of New York, through its Office of the Inspector General, finally began an investigation into Plaintiffs' claims over two and a half years after Plaintiffs first reported Judge Miller's sexual harassment and abuse.

70.     Upon information and belief, the Inspector General's investigation was begun only when UCS was forced to take action when rumors began circulating amongst Broome County Family Court personnel regarding the existence of a nude photograph of Darlene Doe.

71.     The Office of the Inspector General completed its investigation of Plaintiffs' complaints in or about August 2017 at which point Judge Miller was administratively reassigned.

72.     By that time, Plaintiffs had unnecessarily been subjected to over two and a half years of severe and pervasive sexual harassment and abuse by Judge Miller.

73.     As a result of Judge Miller's harassment and abuse, Plaintiffs have suffered and continue to suffer from severe emotional distress, emotional pain and suffering, and health effects including, but not limited to, stomach ulcers, stomach cramps, severe headaches, inability to sleep, and severe anxiety.

74.     Plaintiffs have also had their personal and professional reputations unfairly tarnished as a result of their forced continued association with Judge Miller and by false rumors, gossip and speculation that Defendants have failed to correct or dispel.

**UCS REMOVES PROTECTIONS AGAINST RETALIATION AVAILABLE TO PLAINTIFFS AND THEN RELATIATES AGAINST PLAINTIFFS**

75.     Approximately four months after the Office of the Inspector General completed its investigation into Judge Miller's harassment, UCS promulgated "revisions" to the Original Sexual Harassment Policy.

76.     Upon information and belief, the revisions to the Original Sexual Harassment Policy were motivated, at least in part, by Plaintiffs' complaints about Judge Miller's harassment and the possible resulting legal ramifications to UCS.

77.     The revisions to the Original Sexual Harassment Policy substantially weakened protections for victims of sexual harassment and discrimination despite an ever-increasing public awareness of the pervasiveness of sexual harassment and discrimination.

78.     The revisions to the Original Sexual Harassment Policy removed all references to sexual harassment as an illegal act.

79.     The revisions to the Original Sexual Harassment Policy also included eliminating portions of the policy that prohibited retaliation for reporting instances of sexual harassment.

80.     The revisions to the Original Sexual Harassment Policy included the <u>removal</u> of key portions of the policy that, among other things: (i) provided additional avenues for victims to report instances of harassment; (ii) emphasized the Unified Court System's commitment to maintaining confidentiality of victims; (iii) discussed victims' rights to be protected from retaliation for reporting instances of harassment; (iv) advised victims of steps they should take to address harassment, including that they should document harassment and their efforts to report it; (v) discussed the harmful impacts of sexual harassment in the workplace; (vi) informed employees of the various ways sexual harassment may occur in the workplace; and (vii) provided an explanation of supervisors' roles in enforcing the policy and protecting employees from harassment and abuse.

81.     Upon information and belief, the revisions to the Original Sexual Harassment Policy were made unilaterally by UCS without any input from other stakeholders such as civil service unions, experts, bar associations, or victims' advocacy groups.

82.     Upon information and belief, the revisions to the Original Sexual Harassment Policy were motivated by a desire to weaken any claim by Plaintiffs against UCS based upon Judge Miller's sexual harassment and abuse and as retaliation for Plaintiffs' reporting Judge Miller's harassment and abuse.

83.     Upon the commencement of the Inspector General's investigation into Plaintiffs' complaints, Plaintiffs were reassigned by UCS to the Sixth Judicial District Administrative Office where their duties, responsibilities, terms and conditions of their employment were materially altered without their consent.

84.     Upon information and belief, from at least the time of their reassignment to present Judge Miller has not exercised any control over any aspect of Plaintiffs' employment.

85.     In or about July/August 2018, Plaintiffs were reassigned back to Broome County Family Court by UCS but were given substantially diminished responsibilities, far reduced workloads, less substantive work, and were isolated from their coworkers.

86.     Upon information and belief, Plaintiffs were given less desirable assignments, diminished responsibilities, reduced workloads and less substantive work, and isolated from their co-workers in retaliation for their reporting Judge Miller's harassment and abuse and for pursuing claims against Defendants before the Equal Employment Opportunity Commission, among other things.

87.     On or about March 20, 2018, Ms. Gallagher was informed by a co-worker at Broome County Family Court that Darlene Doe had stated that she was going to physically harm Ms. Gallagher and Mr. Kachadourian in their workplace.

88.     Upon information and belief, UCS was aware of this threat on or before March 20, 2018.

89.     Plaintiffs were not officially informed about Darlene Doe's threat by UCS and, upon information and belief, no security measures were put in place to protect them.

90.     On or about March 28, 2018, Ms. Gallagher and Mr. Kachadourian were informed that Ian Doe – the boyfriend of Darlene Doe and a close associate of Judge Miller – had recently obtained a pistol permit and was overheard saying that if he became terminally ill he was going to put a bullet in the head of Ms. Gallagher and Mr. Kachadourian.

91.     Nevertheless, in or about April 2018, UCS permitted Darlene Doe to return to work at Broome County Family Court from leave and Ms. Doe continues to work in the same building and on the same floor as Plaintiffs.

92.     In addition, on two occasions, Nicholas Doe – a close friend and associate of Judge Miller that is known to carry a pistol – has been permitted to access a secured, non-public area of the courthouse building where Ms. Gallagher's office is located with the consent and assistance of employees of UCS.

93.     On at least one of those occasions, Nicholas Doe made direct eye contact with Ms. Gallagher in a menacing manner.

94.     Upon information and belief, Nicholas Doe's actions were intended to intimidate, frighten and alarm Ms. Gallagher so as to prevent her from pursuing any further action related to Judge Miller's harassment and abuse.

95.     After the first incident where Nicholas Doe was permitted to access the restricted area in front of Ms. Gallagher's office, Ms. Gallagher reported the breach to the Chief Clerk.

96.     Nevertheless, the second breach occurred approximately four days later.

97.     Moreover, on or about November 9, 2018, Ms. Gallagher observed Judge Miller's personal secretary taking photographs of her home.

98.     Upon information and belief, Judge Miller authorized or directed these activities in order to intimidate, frighten and alarm Ms. Gallagher in retaliation for reporting his harassment and abuse and to prevent Plaintiffs from pursuing any further action related to Judge Miller's harassment and abuse.

**FIRST CAUSE OF ACTION**
**TITLE VII - Retaliation**
**Against All Defendants**

99.     Plaintiffs repeat and reallege each and every one of the foregoing paragraphs as though fully set forth in this paragraph.

100.     Plaintiffs each engaged in protected activities as defined in 42 U.S.C. § 2000e-3 by, among other things, reporting Judge Miller's sexual harassment and discrimination, reporting Defendants' inaction in responding to said sexual harassment and discrimination, pursuing claims against Defendants before the EEOC, and otherwise opposing said sexual harassment and discrimination.

101.     Defendants were aware that Plaintiffs had engaged in such protected activities.

102.     As a result of Plaintiffs having engaged in said protected activities, Defendants took adverse employment actions against Plaintiffs and unlawfully retaliated against them by, among other things, revising the Original Sexual Harassment Policy to afford them fewer protections from sexual harassment, giving them less desirable work assignments and less substantive work, failing to provide them with a safe working environment, failing to safeguard them from threats of physical harm in the workplace, and by authorizing, directing, or failing to prevent their employees and agents from stalking and harassing Plaintiffs.

103.     As a direct and proximate result of Defendants' acts and omissions, Plaintiffs are entitled to compensatory and punitive damages for, among other things, mental anguish, reputational damage, emotional distress, and physical and mental pain and suffering.

## SECOND CAUSE OF ACTION
### TITLE VII – Hostile Work Environment
### Against All Defendants

104.    Plaintiffs repeat and reallege each and every one of the foregoing paragraphs as though fully set forth in this paragraph.

105.    The aforementioned misconduct by Defendants was sufficiently severe and pervasive and subjectively and objectively offensive so as to create an abusive and hostile workplace permeated with discriminatory intimidation, ridicule and insult.

106.    Said discriminatory intimidation, ridicule and insult unreasonably interfered with Plaintiffs' work performance.

107.    Defendants are liable for the creation of such hostile and abusive working environment as a result of their deliberate indifference to Plaintiffs' complaints of sexual harassment and discrimination, failure to adequately manage, train, supervise, control, and direct the actions of their subordinates, agents, and employees so as to allow the creation and continuation of such hostile and abusive working environment, by failing to respond to Plaintiffs' complaints regarding such hostile and abusive working environment, by failing to exercise reasonable care to prevent, investigate, or remediate such conduct, by failing to implement programs and policies to discourage or address such conduct, by adopting, implementing, and by encouraging *de facto* policies, procedures, and customs that effectively suppressed Plaintiffs' attempts to report and remedy such hostile and abusive working environment, and by allowing its employees and agents to engage in acts and omissions which affirmatively created such hostile and abusive working environment.

108.    As a direct and proximate result of Defendants' acts and omissions, Plaintiffs are entitled to compensatory and punitive damages for, among other things, resulting mental anguish, reputational damage, emotional distress, and physical and mental pain and suffering.

### THIRD CAUSE OF ACTION
### 42 U.S.C. § 1983 (Equal Protection)
### Against Defendant Richard Miller, II

109.    Plaintiffs repeat and reallege each and every one of the foregoing paragraphs as through fully set forth in this paragraph.

110.    At all relevant times Judge Miller was acting under color of state law.

111.    Judge Miller intentionally utilized the authority vested in him by the State of New York to discriminate against Plaintiffs on the basis of sex and to violate Plaintiffs' rights, privileges, and immunities secured under the Fourteenth Amendment to the United States Constitution.

112.    As a result of said violations, Plaintiffs are entitled to compensatory and punitive damages for, among other things, resulting mental anguish, reputational damage, emotional distress, and physical and mental pain and suffering.

### FOURTH CAUSE OF ACTION
### Intentional Infliction of Emotional Distress
### Against Defendant Richard Miller, II

113.    Plaintiffs repeat and reallege each and every one of the foregoing paragraphs as though fully set forth in this paragraph.

114.    The aforementioned acts and omissions by Judge Miller constituted extreme and outrageous conduct which was intended to cause, or was done with reckless disregard of a substantial probability of causing, severe emotional distress.

115.    As a result of the foregoing acts and omissions, Plaintiffs were caused to suffer extreme emotional distress and associated health effects for which they are entitled to compensatory and punitive damages.

### FIFTH CAUSE OF ACTION
**Negligent Infliction of Emotional Distress**
**Against Defendant Richard Miller, II**

116.    Plaintiffs repeat and reallege each and every one of the foregoing paragraphs as though fully set forth in this paragraph.

117.    Judge Miller owed Plaintiffs a direct duty of care and his breach of that duty of care endangered Plaintiffs' physical safety and placed Plaintiffs' in fear for their physical safety.

118.    The aforementioned breach by Judge Miller created an unreasonable risk of causing Plaintiffs emotional distress and such emotional distress was a foreseeable result of such breach.

119.    Judge Miller's acts and omissions caused Plaintiffs' severe emotional distress and associated health effects for which they are entitled to compensatory damages.

### SIXTH CAUSE OF ACTION
**N.Y. Executive Law § 290 et seq. ("NYS Human Rights Law") –**
**Retaliation and Aiding and Abetting Retaliation**
**Against Defendant Richard Miller, II**

120.    Plaintiffs repeat and reallege each and every one of the foregoing paragraphs as though fully set forth in this paragraph.

121.    Plaintiffs each engaged in protected activities as defined in N.Y. Executive Law § 296(e) by, among other things, reporting sexual harassment and discrimination, reporting Defendants' inaction in responding to said sexual harassment and discrimination, pursuing claims against Defendants before the EEOC, and otherwise opposing sexual harassment and discrimination.

122.   Judge Miller was aware that Plaintiffs had engaged in said protected activities.

123.   As a result of Plaintiffs having engaged in said protected activities, Judge Miller retaliated against Plaintiffs and aided and abetted retaliation against Plaintiffs by UCS and others.

124.   As a result of Judge Miller's acts and omissions, Plaintiffs are entitled to compensatory and punitive damages for, among other things, resulting mental anguish, emotional distress, and physical and mental pain and suffering.

**SEVENTH CAUSE OF ACTION**
**NYS Human Rights Law –Aiding and Abetting Hostile Work Environment**
**Against Defendant Robert Miller, II**

125.   Plaintiffs repeat and reallege each and every one of the foregoing paragraphs as though fully set forth in this paragraph.

126.   The aforementioned harassment and abuse was sufficiently severe and pervasive and subjectively and objectively offensive so as to create an abusive and hostile workplace for Plaintiffs permeated with discriminatory intimidation, ridicule and insult.

127.   Said discriminatory intimidation, ridicule and insult unreasonably interfered with Plaintiffs' work performance.

128.   Judge Miller's acts and omissions aided and abetted the creation of said hostile workplace.

129.   As a result of Judge Miller's acts and omissions, Plaintiffs are entitled to compensatory and punitive damages for, among other things, resulting mental anguish, emotional distress, and physical and mental pain and suffering.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request that this Court enter judgment in favor of the Plaintiffs as follows:

A.      Declaring the aforementioned acts, omissions, policies, practices, and/or customs of Defendants to be in violation of Title VII, the New York State Human Rights Law, and 42 U.S.C. § 1983, and New York State common law;

B.      Enjoining Defendants from engaging in further violations of Title VII, the New York State Human Rights Law, 42 U.S.C. § 1983, and New York State common law;

C.      Awarding Plaintiffs compensatory and punitive damages, reasonable attorneys' fees, and the costs and expenses of this action.

D.      Awarding such other and further relief as this Court deems just and proper.

Dated:  December 21, 2018
        Albany, New York

DREYER BOYAJIAN LLP

/s/ William J. Dreyer, Esq.
Bar Roll No. 101539
/s/ Joshua Friedman, Esq.
Bar Roll No. 520628
*Attorneys for Plaintiffs*
75 Columbia Street
Albany, New York 12210
T: (518) 463-7784
F: (518) 463-4039