**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**RACHELLE GALLAGHER; and**
**MARK KACHADOURIAN,**

                                         **Plaintiffs,**

**v.**                                                    **3:18-CV-01476 (GTS/ML)**

**THE UNIFIED COURT SYSTEM**
**OF THE STATE OF NEW YORK; and**
**RICHARD MILLER, II, individually and in**
**his official capacity,**

                                         **Defendants.**
_____

**GLENN T. SUDDABY, United States District Judge**

<u>DECISION and ORDER</u>

**I.      INTRODUCTION**

        Plaintiffs Rachelle Gallagher and Mark Kachadourian commenced this

employment discrimination action against Defendants the Unified Court System of the

State of New York ("UCS"), and former Broome County Family Court Judge Richard

Miller, II. *See* Compl., ECF 1.  Plaintiffs assert claims pursuant to Title VII of the Civil

Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* ("Title VII"), 42 U.S.C. § 1983 ("§ 1983"),

the New York State Human Rights Law, N.Y. Exec. L. § 290 *et seq.* ("NYHRL"), and

New York State common law. *See id*.  More specifically, Plaintiffs assert the following

claims: Title VII retaliation by UCS and Miller (First Cause of Action); Title VII hostile

work environment by UCS and Miller (Second Cause of Action); a § 1983 Equal

Protection violation by Miller (Third Cause of Action); intentional infliction of emotional

distress ("IIED") by Miller (Fourth Cause of Action); negligent infliction of emotional

distress ("NIED") by Miller (Fifth Cause of Action); NYSHRL retaliation and aiding and abetting retaliation by Miller (Sixth Cause of Action); and NYSHRL aiding and abetting a hostile work environment by Miller (Seventh Cause of Action). *See id*.

Miller moves for summary judgment on all claims against him. *See* ECF 159. Plaintiffs oppose this motion in part, *see* ECF 170, and Miller files a reply. *See* ECF 173. UCS also moves for summary judgment on all claims against it. *See* ECF 163.  Plaintiffs oppose this motion, *see* ECF 169, and UCS files a reply. *See* ECF 172.

The Court will decide the pending motions on the papers and without oral argument.  For the following reasons, each motion is granted in part and denied in part.

## II.    BACKGROUND[1]

### Plaintiffs' Initial Employment Positions

Miller was elected to a ten-year term as a Broome County Family Court Judge, a position he began on January 1, 2015. *See* UCS Local Rule 56.1 Statement ("UCS Stat."), ECF 163-7, ¶ 1.[2]  Judges in Broome County Family Court, including Miller, have a team comprised of judicial and nonjudicial personnel. *See* Miller Statement of Material Facts ("Miller Stat."), ECF 159-1, ¶  24.  Carolyn Grimaldi, Director of Human Resources and Director of Labor Relations in the Office of Court Administration ("OCA"), states that New York law provides that "Family Court judges outside of New York City, who are independently elected judicial officers, have appointment, oversight, and removal authority over their personal staff appointees." Grimaldi Jan. 13, 2023 Declaration

---

[1] **On the pending motions, the Court considers the parties' Local Rule 56.1 statements and the admissible evidence submitted by the parties.** *Holtz v. Rockefeller & Co.*, **258 F.3d 62, 73 (2d Cir. 2001). The Court construes the evidence in the light most favorable to Plaintiffs.** *Doninger v. Niehoff*, **642 F.3d 334, 344 (2d Cir. 2011).**

[2] Unless indicated otherwise, the Court cites to Defendants' Local Rule 56.1 Statements of Material Facts where Plaintiffs have either admitted the facts asserted or failed to adequately oppose properly supported facts.

("Grimaldi Decl."), ¶¶ 4-5 (citing N.Y. Const. Art. VI,  §§ 28(b), 28(c), and 22 NYCRR §

80.1(b)(3)).  Grimaldi also asserts that "unlike all other non-judicial employees, UCS and

the Chief Administrator of the Courts do not have authority to appoint, remove, or

oversee the personal staff appointees of a judge or justice, where the delegated

authority under 22 NYCRR § 80.1(b)(3) exclusively places that sole authority with each

individual justice or judge, including Family Court Judges outside of New York City." *Id.*

§ 7.  UCS asserts that pursuant to UCS policy, UCS employees do not engage in the

selection or removal of personal staff appointees of judges or justices, including Family

Court judges outside of New York City. *See* UCS Stat., ¶ 15.  Plaintiffs deny this

contention in part and indicate that, on December 31, 2021, they were removed from

their positions by UCS and not by a judge.  Pls. Resp. to UCS Stat., ECF 169-13, ¶ 15

(citing Gallagher Decl., ¶ 29, Kachadourian Decl., ¶ 28).

Gallagher was a personal friend of Miller, had worked with him in Johnson City

Village Court for approximately ten years before he ran for Broome County Family Court

Judge, and assisted Miller in his campaign for Family Court Judge. *See* UCS Stat., ¶¶

2-3.  After Miller was elected, he appointed Gallagher as his Judicial Secretary, a

position she began on January 2, 2015.  Miller Stat., ¶ 19; UCS Stat., ¶ 4.  UCS

accepted Gallagher's nomination for appointment for this position, which was ultimately

approved by the Chief Administrator of the Courts. Gallagher 02/21/23 Declaration

("Gallagher Decl."), ECF 169-2, ¶ 4.  Gallagher was provided an office adjoining Miller's

chambers on the first floor of the Broome County Family Court courthouse. *Id.*, ¶ 5; *see*

Miller Stat., ¶ 20. Gallagher's duties included answering the phone, taking messages,

and sitting at her desk "manning the office." UCS Stat., ¶ 5; *see id.*, ¶ 21.

Kachadourian also assisted with Miller's campaign. UCS Stat., ¶ 7.  Miller selected Kachadourian as his Court Attorney – the equivalent of a law clerk – a position Kachadourian began on January 2, 2015. Miller Stat., ¶ 19; UCS Stat., ¶ 6. UCS accepted Kachadourian's nomination for appointment, which was ultimately approved by the Chief Administrator of the Courts. Kachadourian 02/21/23 Declaration ("Kachadourian Decl."), ECF 169-8, ¶ 4.  Kachadourian was provided office space on the second floor of the Broome County Family Court courthouse.  *Id.*, ¶ 5.  While he did not sit in Miller's chambers on the first floor, he spent time there consistent with Miller's preference. *See* Miller Stat., ¶ 21; UCS Stat. ¶ 19. Kachadourian's duties included assisting in writing decisions and holding conferences with attorneys on behalf of Miller. UCS Stat. ¶ 8.  Kachadourian also took a number of trips with Miller as part of Kachadourian's job duties. *Id.,* ¶ 20.

Alanna Vroman, a Principal Court Analyst responsible for Human Resources matters within UCS, testified that "judges have discretion to evaluate [their employees] in whatever way they deem appropriate." Vroman Dep., ECF 163-5, at 81.  Vroman further testified that personal appointees, such as Plaintiffs, "serve at the discretion of their judge . . . ."  *Id.*, at 165.  Gregory Gates, former District Executive for the Sixth Judicial District, testified that "Court staff, chamber staff[,] are supervised only by the judges that appoint them . . . ." Gates Dep., ECF 163-6, at 95.

There is no dispute that Miller conducted Plaintiffs' performance evaluations while they worked directly for him. UCS Stat. ¶¶ 9-11.  Plaintiffs contend, however, that upon Miller's reassignment in July 2017 (discussed below), and his subsequent removal from the bench (also discussed below), Plaintiffs were not personal appointees serving

4

at Miller's discretion.  Rather, they contend, they reported to and were supervised by

other UCS personnel. *See* Gallagher Decl., ¶¶ 15-19; Kachadourian Decl., ¶¶ 12-19.  In

this context, Plaintiffs admit that from January 2015 to July 2017, they were Miller's

personal judicial appointees, but contend that after July 2017 they "were employees or

*de facto* employees of UCS and no longer personal appointees of Judge Miller." Pls.

Resp. to Miller Stat., ¶ 22.

### Plaintiffs' allegations of sexual harassment and threats by Miller

Plaintiffs contend that from January 2015 to July 2017, they were subjected to

ongoing sexual harassment and threats of physical violence by Miller. *See* Gallagher

Decl., ¶¶ 6-7; Kachadourian Decl., ¶¶ 6-7.  Plaintiffs assert:

These incidents were many, but included the following:

- Judge Miller stated if [either Plaintiff] ever betrayed him, [they] would be found at the bottom of the river in cement boots.
- Judge Miller would repeatedly complain out loud about his lack of sexual activity with his wife and demand that his needs be satisfied.
- Loud and obscene phone and in-person conversations by Judge Miller and his friends about their sexual relationships, including intimate and graphic details about another female court employee.
- Judge Miller would attempt to show [Plaintiffs] pornographic images of women on his phone[,] showed [Kachadourian] a nude photograph of another female court employee[,] and would trick [Gallagher] into viewing pornographic images.
-Ongoing comments by Judge Miller about other women's anatomies and breast size, including sexual comments about other female court employees.

Gallagher Decl., ¶ 6; Kachadourian Decl., ¶ 6.

In addition, Plaintiffs assert that in May 2017, Miller was upset that a local State

Senator refused to give him his personal cell phone number. Gallagher Decl., ¶ 7;

Kachadourian Decl., ¶ 7.  Kachadourian asserts that Miller told him that he "had to

speak with Ms. Gallagher about satisfying the State Senators sexual needs in order to

curry political favor for Judge Miller." Kachadourian Decl., ¶ 7.  Kachadourian contends

that this made him "extremely uncomfortable." *Id.*  Gallagher contends that Miller "began screaming at [her] to go up to Albany and take care of the State Senator's sexual needs, in order to curry political favor for Judge Miller." Gallagher Decl., ¶ 7.  Gallagher asserts that she refused and "became visibly upset and frightened." *Id.*

Plaintiffs assert that overall the "comments and demands by Judge Miller were degrading, embarrassing and made [them] fearful." Gallagher Decl., ¶ 10; Kachadourian Decl., ¶ 10.[3]

### Plaintiffs' Complaints About Miller's Conduct

The Sexual Harassment Policy in effect at the time ("the Original Sexual Harassment Policy") provided in pertinent part that UCS employees who believed they had been sexually harassed had a "number of options," and employees "[didn't] have to try any one in particular, and … may try more than one in succession or at the same time." Original Sexual Harassment Policy, ECF 169-5, at 5-6.  These options included "[d]iscuss[ing] the problem with any supervisor or manager within the Unified Court System;" "[c]all[ing] on a member of the Unified Court System's Anti-Discrimination Panels;" and "[m]ak[ing] a formal complaint of sexual harassment by asking a supervisor or manager to initiate an investigation or by going to the Office of the Special Inspector General for Bias Complaints." *Id.* at 6.[4]

---

[3] Although Plaintiffs allege identical or substantially similar facts in their declarations, the Court cites to the pertinent paragraphs in each declaration.

[4] *See also id.*, at 8 ("If you would feel more comfortable discussing the harassment with a supervisor or manager who does not oversee your work, you should feel free to do so. All Unified Court System supervisors and managers are responsible for implementing and enforcing the Unified Court System's policy on sexual harassment and for helping court employees who are subjected to unwelcome sexual behavior. They are prepared to take steps to prevent harassment and to stop it when it occurs. It is simply part of their jobs.").

Plaintiffs maintain that "[b]etween 2015 and 2017, [they] frequently made oral complaints of Judge Miller's sexual harassment and threats to the Broome Family Court Chief Clerk, Debbi Singer." Gallagher Decl., ¶ 8; Kachadourian Decl., ¶ 8.  Former District Executive Gates stated that, under the Original Sexual Harassment Policy, the Chief Clerk in a courthouse is an appropriate person to whom a judge's personal appointees could raise concerns or make a complaint of sexual harassment by a judge. Gates Dep., ECF 163-6, at 105.

Kachadourian attests that he met "with the Chief Clerk along with Rachelle Gallagher" to lodge complaints against Miller. Kachadourian Decl., ¶ 8.  Plaintiffs assert that, during these meetings, they reported complaints of sexual harassment and workplace threats by Miller to Singer "approximately fifty or more times." Gallagher Decl., ¶ 9; Kachadourian Decl., ¶ 9.  Plaintiffs contend that they "believed [their complaints] to be 'formal' complaints for purposes of reporting sexual harassment because [they] could not report these complaints to Judge Miller and the Chief Clerk was a supervisor at Broome County Family Court. [They] reported these complaints to the Chief Clerk in accordance with UCS's Sexual Harassment Policy that was in place at the time." Gallagher Decl., ¶ 8; Kachadourian Decl., ¶ 8.  Plaintiffs admit that none of these complaints were in writing. Miller Stat., ¶ 28.

Singer testified that Gallagher first came to her in 2015 complaining about Miller's treatment of her as it pertained to restrictions on Gallagher socializing with others in the office, eating lunch in the lunchroom, and keeping the door to her office open.  Singer Dep., ECF 159-13, at 64-65, 29.  Singer stated that she did not do anything in response to these complaints because Gallagher was "Judge Miller's employee—her complaints

7

at the time were just her Judge's wants and the Judge can tell a secretary, Court Attorney, to do anything they want." *Id.*, at 64; *see id.*, at 129.

Singer further testified that Gallagher's and Kachadourian's complaints about Miller's alleged sexual harassment and threatening behavior began in late 2016. *Id.*, at 64; *see id.*, at 130-31 (Gallagher's complaints transitioned to issues of a sexual nature in late 2016).  "While Ms. Singer agrees Plaintiffs visited her office multiple times to discuss Mr. Miller, she characterizes their visits as 'talks' or 'venting,' not formal complaints about sexual harassment." Miller Stat., ¶ 29. Singer stated that she understood a formal complaint would have been in writing. *See* Singer Dep., at 123.[5] "Ms. Singer characterizes Mr. Kachadourian and Ms. Gallagher to have often 'overreacted' and frequently 'rehashed' the same issues in their multiple visits to her office." Miller Stat., ¶ 29.  Nevertheless, Singer testified that, when Gallagher first began reporting sexual harassment from Miller, Singer advised Gallagher "that she should go up her chain of command with her complaints," meaning that she "could go to Human Resources or to the Administrative Judge who would oversee Judge Miller." Singer Dep., ECF 159-13, at 65; *see id.*, at 66-68, 123-24.

### Reports of Plaintiffs' Internal Complaints

Plaintiffs assert that, as a result of a *de facto* policy and the inaction of UCS, their complaints were ignored for nearly two and a half years causing them to suffer additional harassment from Miller. *See* Compl., ¶¶ 3, 65, 68.  Singer testified that she

---

[5] *See also id.,* at 122 ("Q. Would it surprise you to hear that Ms. Gallagher believes she came to you between 20 and 30 times to make formal complaints about Judge Miller? A. It would surprise me with the word formal. If it was a formal complaint, I would have guessed it would be in writing. She would come down to my office and vent."); id. at 124 ("Q. Would it surprise you to hear [Gallagher] believes that both [Plaintiffs] came to you to make formal complaints at least 20 to 30 times? A. I don't think 'formal' is the word to be used here. They never formally complained to me.").

did not initially report Plaintiffs' complaints of Miller's alleged sexual harassment and threatening behavior, or talk to Miller about the alleged behavior, because "every time [Plaintiffs] came to [her], they insisted that [she] couldn't say anything to anyone because they were afraid of retaliation." Singer Dep., at 135.[6]  The exception to this was when Plaintiffs complained about threats to their lives. *Id.,* at 124.  Singer believes that she reported such complaints sometime in 2017. *Id.,* at 125.

Former District Executive Gates indicates that he received notification sometime in 2017 that Plaintiffs had spoken with Singer "to discuss certain events that had occurred that were of concern to them," which included concerns about their health and safety, inappropriate discussions regarding sexual activities, electronic depictions on at least one cell phone of a sexual nature, and that Gallagher was being asked to do things on behalf of Miller related to his private law practice. *See* Gates Dep., ECF 163-6, at 38-40.[7]  On the advice of the Administrative Judge, Gates contacted the Office of the Inspector General of the Unified Court System which began an investigation into Miller's conduct. *Id.* at 40-41; *see* Gallagher Decl., ¶ 11; Kachadourian Decl., ¶ 11.

### Complaint to the New York State Commission on Judicial Conduct

In addition, it is undisputed that "Plaintiffs – or one of them – made a complaint to the New York State Commission on Judicial Conduct (the "CJC" or the "Commission") against Mr. Miller concerning several claims, including many allegations contained in their Complaint" in this matter. Miller Stat., ¶ 34.  It appears that the CJC complaint

---

[6] *See id.* at 156 ("[T]hey always begged me, pleaded, insisted that I could not tell anyone or there would be repercussions.").

[7] *See also id.* at 45-46 (testifying that he received an email from Singer on June 30, 2017 indicating that Plaintiffs expressed the concern that "this could turn into a workplace violence situation" if Miller became aware of an investigation into his conduct).

provided the impetus to reassign Plaintiffs and Miller, and commence an Inspector General's Office investigation into Miller's conduct. *See* Gallagher Decl., ¶ 11; Kachadourian Decl., ¶ 11

**Plaintiffs' and Miller's 2017 Reassignments**

Plaintiffs assert that in June or July 2017, UCS, through former District Executive Gates, reassigned them to work in the Sixth Judicial District office and separated them from Miller. Gallagher Decl., ¶ 12; Kachadourian Decl., ¶ 12.  USC contends that this was a temporary move ordered by the Chief Administrative Judge. *See* C. Grimaldi March 6, 2023 Supplemental Declaration ("Grilmaldi Suppl. Decl."), ECF 172-1, at ¶ 4 ("On or about July 3, 20 17, Judge Richard Miller's personal appointees, Mark Kachadourian and Rachelle Gallagher, were temporarily moved from his chambers to the Sixth Judicial District Office upon administrative removal of Judge Miller from the bench as ordered by Chief Administrative Judge Lawrence K. Marks."). During this time, Gallagher worked for two Court Attorneys on foreclosure matters and reported to the District Executive. Gallagher Decl., ¶ 12.  Kachadourian assisted with matrimonial and civil litigation matters and reported to the District Executive. Kachadourian Decl., ¶ 12.


In July 2017, the Office of Court Administration ("OCA") reassigned Miller from presiding over Family Court matters to handling foreclosure matters. Miller Stat., ¶ 35. Upon reassignment, Miller worked out of the State Office Building.  *Id.*, ¶ 36.[8]

---

[8] *See also Matter of Miller (New York State Commn. on Jud. Conduct)*, 35 N.Y.3d 484, 488 (NY 2020) ("*Matter of Miller*") ("In July 2017, [Miller] learned that a complaint had been made against him, he was unable to access his chambers, and the Commission had taken possession of boxes containing his tax records that were stored in his chambers. In addition, the Inspector General for the Unified Court System questioned him about his receipt of checks in connection with one of the cases for which he received the income in late 2015.").

After Miller had been reassigned to work at the State Office Building, Plaintiffs were directed by the District Executive to return to work at the Broome County Family Court courthouse. Gallagher Decl., ¶ 14; Kachadourian Decl., ¶ 14.[9] Gallagher asserts that, upon her return to the Broome County Family Court courthouse, she reported to the Chief Clerk, initially Debbi Singer, and then Cheryl Lidell-Obenauer after Singer retired.  Gallagher Decl., ¶ 16.  Gallagher contends that her duties, "although diminished in nature, included assisting the Chief Clerk, such as processing orders and working at the clerk's office window. During this time, [she] also filled in for Judge Pines' secretary while she was out on leave for one month." *Id.*  Kachadourian asserts that upon his return to the Broome County Family Court courthouse, he reported to Singer and then Lidell-Obenauer after Singer retired.  Kachadourian Decl., ¶ 16.  He contends that he "returned to [his] office space on the second floor and occasionally was given work from other judges, court attorneys, the Chief Clerk and/or court staff including assisting with adoption proceedings, writing decisions, responding to New York State Department of Health information requests, and handling attorney conferences." *Id.*

Plaintiffs contend that, after their reassignments, "their duties, responsibilities, terms and conditions of their employment were materially altered without their consent, Compl., ¶ 83, and were "given substantially diminished responsibilities, far reduced workloads, less substantive work, and were isolated from their coworkers." *Id.,* ¶ 85. These changes in their working conditions, Plaintiffs maintain, were in retaliation for their complaints about Miller's purported harassment and "for pursuing claims against

---

[9] *See also* Grilmaldi Suppl. Decl., at ¶ 4 ("Approximately two weeks later, Mr. Kachadourian and Ms. Gallagher were subsequently returned to their previous location at Broome County Family Court pending the investigation and determination of the Commission of Judicial Conduct regarding Judge Miller's referral to the Commission.").

Defendants before the Equal Employment Opportunity Commission, among other things." *Id.,* ¶ 86.

**Oversight After 2017 Reassignments**

Neither Kachadourian nor Gallagher has worked with Miller since July 2017. Miller Stat., ¶ 37; Gallagher Decl., ¶ 15; Kachadourian Decl., ¶ 15.  Plaintiffs contend that they were informed that while working at the Sixth Judicial District Office, Miller attempted to terminate them "but was told by UCS that he lost the ability" to do so. Gallagher Decl., ¶ 13; Kachadourian Decl., ¶ 13.

Plaintiffs assert that from July 2017 until their terminations, they reported all sick and vacation time to either the District Executive or the Chief Clerk for approval; their performance evaluations were done by the Chief Clerk; and either the District Executive or the Chief Clerk approved their timesheets. Gallagher Decl., ¶¶ 17-19; Kachadourian Decl., ¶¶ 17-19.

Gallagher physically reported to work at the Broome County Family Court until approximately April 2019, when she went out on Family and Medical Leave Act, then excused leave thereafter. Gallagher Decl., ¶ 28.  She remained employed by UCS until December 31, 2021. *Id.,* ¶ 29.  Kachadourian "physically reported to work at the Broome County Family Court and remained employed by UCS until December 31, 2021 when [he] was terminated." Kachadourian Decl., ¶ 28.

**Revisions to the Original Sexual Harassment Policy**

There is no dispute that personal appointees to judges are employed by UCS and are entitled to the same rights enumerated in UCS's Sexual Harassment Policy. Miller Stat., ¶ 23.  Plaintiffs contend that after the Inspector General's Office completed

its investigation, "UCS promulgated 'revisions' to the Original Sexual Harassment Policy" which "substantially weakened protections for victims of sexual harassment and discrimination despite an ever-increasing public awareness of the pervasiveness of sexual harassment and discrimination." Compl., at ¶¶ 75, 77. These revisions, Plaintiffs maintain, "were motivated, at least in part, by Plaintiffs' complaints about Judge Miller's harassment and the possible resulting legal ramifications to UCS," and were intended as retaliation for Plaintiffs reporting Miller's "harassment and abuse." *Id.,* ¶¶ 76-82.

There is no dispute that UCS revised the Original Sexual Harassment Policy in 2017 due to "general heightened awareness of the sexual harassment issue, and the Me Too movement in the media," not "the Judge Miller situation" concerning Gallagher or Kachadourian. Miller Stat., ¶ 25. Furthermore, there is no dispute that changes to the Original Sexual Harassment Policy were not discussed with Miller. *Id.,* ¶ 26.

### 2018 Threatening Circumstances

Plaintiffs assert that in 2018, they were "informed by Judge Molly Fitzgerald of a death threat by one of Judge Miller's associates, . . . who, upon information and belief, had his pistol permit suspended due to the reported threats made against [Plaintiffs]. As a result, the incident was reported to the police." Gallagher Decl., ¶ 25; Kachadourian Decl., ¶ 25.

Plaintiffs also assert that "[i]n 2018, there was another incident where the female court employee whose nude picture Judge Miller circulated threatened to physically harm [Plaintiffs]." Gallagher Decl., ¶ 26; Kachadourian Decl., ¶ 26. Plaintiffs assert that they expressed to the Chief Clerk their fear for their safety, yet nothing was done and "this court employee was permitted to return to work at the courthouse without being

13

required to go through the magnetometer." Gallagher Decl., ¶ 26; Kachadourian Decl., ¶ 26.

In addition, Plaintiffs assert that "[o]n two separate occasions in 2018, an attorney with strong ties to Judge Miller was permitted in the area restricted to non-court personnel where [Plaintiffs' offices were located], despite prior complaints to UCS of the conduct." Gallagher Decl., ¶ 27; Kachadourian Decl., ¶ 27.

### CJC Formal Written Complaint Against Miller

The CJC served a Formal Written Complaint, dated July 9, 2018 (the "CJC Complaint"), on Miller containing four charges: Charge I – Miller "engaged in a pattern of inappropriate behavior toward certain staff members of the Broome County Family Court including unwelcome comments of a sexual nature;" Charge II – Miller "lent the prestige of judicial office to advance his private interests and failed to conduct his extra-judicial activities so as to minimize the risk of conflict with his judicial obligations in that he asked his court secretary and court attorney to perform services unrelated to their official duties;" Charge III – Miller "improperly engaged in the practice of law" "while a full-time judge;" and Charge IV – Miller "failed to file timely and accurate disclosure reports of his income from his extra-judicial activities[.]" Miller Stat., ¶ 38.  Miller filed a Verified Answer dated August 8, 2018, and, by Order dated September 18, 2018, the CJC designated Robert A. Barrer, Esq. as referee ("Referee Barrer") to hear the matter and report proposed findings of fact and conclusions of law. *Id.*, ¶¶ 39-40.

A hearing was held on January 7-11, 2019 in Binghamton, New York, and on February 12, 2019 in Albany, New York, in which both Plaintiffs testified. *Id.*, ¶ 41. Referee Barrer filed a report dated June 20, 2019 in which he sustained portions of

Charges I and II, found Charge III not proved, and sustained Charge IV. *Id.*, ¶ 42. Charge I contained many of the same allegations as contained in the Complaint in the instant matter, *see* Miller Stat., ¶¶ 43, 47, 59, 61, 62, 67, 75, 77, 80, 83, 96, but Referee Barrer did not sustain the CJC Complaint in these regards because he found, *inter alia*, that Plaintiffs were not credible witnesses. *See id.*,  ¶¶ 46, 48, 63-66, 68, 78, 81, 84, 97. Plaintiffs argue that Referee Barrer's specific written findings rely on a third-party proceeding and credibility findings that are not material for purposes of summary judgment. *See, e.g.*, Plfs. Resp. to Miller Stat., ¶ 46.

On February 14, 2020, the Commission unanimously determined that Miller's actions violated several sections of the Rules of Judicial Conduct. *Matter of Miller,* 35 N.Y.3d at 489.  "A majority of the Commission members concluded that removal from office was the appropriate sanction in light of [Miller's] three separate categories of misconduct, his prior censure by the Commission, his failure to take responsibility for his actions, and the message that another censure would send to the public. Two Commission members dissented in part on the ground that censure, rather than removal, was an adequate sanction." *Id.*

Miller petitioned the New York State Court of Appeals for review of the Commission's determination that he committed certain acts of misconduct and should be removed from office. *See id.,* at 486. The Court held as follows: "Upon our independent review of the record, we sustain the Commission's findings and conclude that [Miller's] broad pattern of misconduct—when considered in the context of his inability to recognize the seriousness of his misconduct and his failure to heed a prior warning, which are significant aggravating factors—warrants removal." *Id*. (internal

quotation marks and brackets omitted).[10]  The sustained charges included Miller's pattern of inappropriate behavior, including making sexualized comments towards the female Chief Clerk and berating a female staff member other than Gallagher. *See id.*, at 486-87, 490. The charges also involved Miller having Gallagher perform legal work for him while he was on the Family Court bench, and failing to report extra-judicial income while on bench. *See id.,* at 487-88, 490-91.

### Circumstances Surrounding Plaintiffs' Employment

Plaintiffs assert that that, during their employment, the following occurred: they were W-2 employees and were paid their salary and benefits by the State of New York; they were members of the CSEA union as part of their employment; they participated in OCA's and UCS's  employment policies such as health benefits, pension benefits, and vacation time; they received raises and step-increases in salary which were determined by New York State "and not Judge Miller;" all training, including orientation, workplace violence and sexual harassment training, was provided by UCS; and their office space, equipment such as computers, internet, and phone systems, and office supplies and furniture were provided by UCS. Gallagher Decl., ¶¶ 20-24; Kachadourian Decl., ¶¶ 20-24.

USC presents evidence that even after being relocated to the Sixth Judicial District office and then back to the Broome Family Court courthouse, "Mr. Kachadourian and Ms. Gallagher remained in their titles as personal appointees of Judge Miller, pending the investigation and determination of the [Commission of Judicial Conduct],

---

[10] *See id.,* at 491 ("Considering [Miller's] misconduct in the aggregate, along with his prior disciplinary history, [Miller] exhibited a pattern of injudicious behavior which cannot be viewed as acceptable conduct by one holding judicial office.  Accordingly, the determined sanction should be accepted, without costs, and Richard H. Miller, II removed from the office of Judge of the Family Court, Broome County.") (internal quotation marks omitted).

and at no time were asked to work outside of their title standards." Grilmaldi Suppl.

Decl., ¶ 5.  Both Plaintiffs testified that, following Miller's administrative reassignment in

2017, each continued working in the same title and at the same salary. *See* Gallagher

Dep., dkt. 163-3, at 277;  Kachadourian Dep., dkt. 163-4, at 32-33, 243, 248.  UCS

asserts that, until Miller's removal from office in October 2020, he retained the status as

a New York State elected official, and no new election could be conducted to fill his

position. *See* Vroman Dep., dkt. 163-5, at 162-63.  USC contends that, as long as Miller

retained his status as an elected judicial officer, he also retained his personally

appointed staff – i.e., Plaintiffs. *See id.*

"On October 15, 2020, the Court of Appeals upheld the Commission's

recommendation to remove Judge Miller from the bench, officially establishing a judicial

vacancy in the Broome County Family Court." Grilmaldi Suppl. Decl., ¶ 6.  USC

contends that "Mr. Kachadourian and Ms. Gallagher were retained in their positions as

personal appointees for the remaining term of the Broome County Family Court judicial

vacancy created by Judge Miller's removal." *Id.*; *see also* N.Y. Jud. L § 36(2) ("Should a

judge . . . of the unified court system cease to hold office for any reason other than

expiration of his term, his personal assistants shall continue in office until a successor is

appointed or elected to fill such vacancy.").  USC further contends that, pursuant to

UCS policy, once a new judge was elected to Miller's former position, the policy and

budgetary authority for Plaintiffs' positions as Miller's secretary and court attorney would

cease. *See* Vroman Dep., dkt. 163-5, at 82-83, 94-96, 162-63.

UCS maintains without contradiction as follows:

Following the general election to fill [Miller's] vacancy, on December 1, 2021,
Mr. Kachadourian and Ms. Gallagher were notified via letter correspondence

17

their services would no longer be needed effective close of business December 31, 2021. This date was the statutory conclusion of the judgeship previously filled by Judge Miller, as a newly elected Family Court judge was elected in November 2021 and took the bench effective January 1, 2022. That judge's individually selected personal appointees filled the slots previously held by Mr. Kachadourian and Ms. Gallagher.

Grimaldi Suppl. Decl., ¶ 7.

## III.   STANDARD OF REVIEW

On a motion for summary judgment the Court must construe the properly disputed facts in the light most favorable to the non-moving party, *see Scott v. Harris*, 127 S. Ct. 1769, 1776 (2007), and may grant summary judgment only where "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is material if it might affect the outcome of the suit under the governing law." *Baldwin v. EMI Feist Catalog, Inc.*, 805 F.3d 18, 25 (2d Cir. 2015). An issue is genuine if the relevant evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).

"The moving party bears the burden of establishing the absence of any genuine issue of material fact." *Zalaski v. City of Bridgeport Police Dep't*, 613 F.3d 336, 340 (2d Cir. 2010) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). Once a defendant has met this initial burden, the plaintiff must "designate specific facts showing that there is a genuine issue for trial." *Celotex Corp.*, 477 U.S. at 323–24 (internal quotation marks omitted). A party opposing a properly supported motion for summary judgment may not rest upon "mere allegations or denials" asserted in his pleadings, *Rexnord Holdings, Inc. v. Bidermann*, 21 F.3d 522, 525-26 (2d Cir. 1994), or on conclusory allegations or unsubstantiated speculation. *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998).

18

The Court's inquiry upon summary judgment is "determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250.  "Summary judgment is appropriate only '[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party.'" *Donnelly v. Greenburgh Cent. Sch. Dist. No. 7*, 691 F.3d 134, 141 (2d Cir. 2012) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

## IV.    DISCUSSION

### A.    USC's Motion

Plaintiffs bring Title VII retaliation and sexual harassment claims against UCS. *See* Compl., First and Second Causes of Action.  To bring these claims, Plaintiffs must show that they were "employees" within the meaning of Title VII. *See* 42 U.S.C. § 2000e–3(a); 42 U.S.C. § 2000e-2(a)(1).  USC moves for summary judgment on the grounds that Plaintiffs do not qualify as "employees" for Title VII purposes.

Title VII defines the term "employee" as "an individual employed by an employer." 42 U.S.C. § 2000e(f). The statute provides four express exemptions to this definition:

> The term "employee" . . . shall not include [1] any person elected to public office in any State or political subdivision of any State by the qualified voters thereof, or [2] any person chosen by such officer to be on such officer's personal staff, or [3] an appointee on the policy making level or [4] an immediate adviser with respect to the exercise of the constitutional or legal powers of the office.

42 U.S.C. § 2000e(f).  USC contends that summary judgment is appropriate because Plaintiffs fall with the "personal staff" exception of § 2000e(f). *See* USC Mem. L., at 5-

10.   Plaintiffs counter that "a material question of fact remains as to whether Plaintiffs were personal appointees of Judge Miller under Title VII" at relevant times, *see* Pl. Mem. L. in Opp. to USC Mot., at 9; that a question of material fact exists as to "whether defendant UCS controlled their employment and was their *de facto* or indirect employer under Title VII," *id.* at 11; and that a question of material fact exists as to whether "UCS's sexual harassment policy was adequately implemented or whether there were adequate avenues for complaints to be made." *Id.* at 12.

"The question of who is an exempt employee is a matter of federal, not state law, although state law may clearly illuminate the job responsibilities and status of individual considered under the statute." *Bland v. New York*, 263 F.Supp.2d 526, 536 (E.D.N.Y. 2003).

> Title VII does not define "personal staff," however the report of the conference committee of the House and Senate on this section states, in relevant part:
>
>> It is the intention of the conferees to exempt elected officials and members of their personal staffs, and persons appointed by such elected officials as advisors or to policymaking positions at the highest levels of the departments or agencies of State or local governments, such as cabinet officers, and persons with comparable responsibilities at the local level. It is the conferees [sic] intent that this exemption shall be construed narrowly. 1972 U.S. Code Cong. & Ad. News 2180.
>
> The Second Circuit has not directly addressed the "personal staff" exemption to Title VII's definition of employee, though it has considered the "policy maker" exemption. *See e.g.*, *Butler v. New York State Dep't of Law*, 211 F.3d 739 (2d Cir.2000) (finding the Deputy Bureau Chief in Attorney General's Office was policy maker within meaning of statute so as to exempt her from protection under Title VII*); see also Tranello v. Frey*, 962 F.2d 244, 250–51 (2d Cir.1992) (holding, under identically worded exemption to ADEA, that policy maker must be chosen by elected official). "The Second Circuit has twice suggested, however, that an elected official's personal staff and his immediate advisors 'refer to persons who would work closely with the elected official.'" [*Maioriello v. New York*, No. 1:05-CV–1062 NAM/DRH, 2008 WL 398483, at *8-9] (N.D.N.Y. Feb. 12, 2008)] (quoting *EEOC v. State of*

> *Vermont*, 904 F.2d 794, 798 (2d Cir.1990), *overruled on other grounds by*
> *Gregory v. Ashcroft*, 501 U.S. 452, 111 S. Ct. 2395, 115 L.Ed.2d 410
> (1991)); *see also Tranello*, 962 F.2d at 249 (finding that the "personal staff"
> category of employee in the ADEA "plainly contemplate[s] exemption for
> persons with a direct relationship to an elected official"). District courts in this
> Circuit, when assessing the personal staff exemption, have looked to the
> level of closeness in the working relationship, as well as whether there was
> an "intima[te] and confidential relationship between an elected official and his
> or her [employee] in the performance of the official's duties," and whether the
> employee "occupie[d] a position of trust and sensitivity." *Bland v. New York*,
> 263 F.Supp.2d 526, 541 (E.D.N.Y.2003).

*Kennedy v. New York*, 167 F. Supp. 3d 451, 455–57 (W.D.N.Y. 2016).

Other Circuits have adopted a non-exhaustive list of factors when considering whether a plaintiff was a member of a defendant's personal staff. *Bland*, 263 F. Supp.2d at 539. Based on a review of Circuit decisions, the Fifth Circuit articulated a six-factor test:

> (1) whether the elected official has plenary powers of appointment and
> removal; (2) whether the person in the position at issue is personally
> accountable only to the elected official; (3) whether the person in the position
> at issue represents the elected official in the eyes of the public; (4) whether
> the elected official exercises a considerable amount of control over the
> position; (5) the level of the position within the organization's chain of
> command; and (6) the actual intimacy of the working relationship between
> the elected official and the person filling the position.

*Teneyuca v. Bexar County*, 767 F.2d 148, 151 (5th Cir. 1985) (citing *Goodwin v. Circuit Court of St. Louis County,* 729 F.2d 541, 548–49 (8th Cir.1984), *cert. denied,* 469 U.S. 828 (1984); *Ramirez v. San Mateo County,* 639 F.2d 509, 511-13 (9th Cir.1981); *Owens v. Rush,* 654 F.2d 1370, 1374–76 (10th Cir.1981)). A court's "consideration of these factors must be tempered by the legislative history of this provision which indicates that the exception is to be narrowly construed." *Id.*, at 152 (citing *Owens,* 654 F.2d at 1375). The Fifth Circuit noted "that the highly factual nature of the inquiry necessary to the determination of the 'personal staff' exception does not lend itself well to disposition by

21

summary judgment," but also found that "several factors" took that case "out of the scope of that general observation." *Id.*  This included that "several of the factors . . . [were] statutorily determined in [that] case, and there [was] no allegation that the actual situation differ[ed] from that provided by statute. Second, and more importantly, the plaintiff did not meet the requirements of Fed. R. Civ. P. 56(e) in responding to the defendants' motion for summary judgment." *Id.*  Thus, the *Teneyuca* Court affirmed the judgment of the district court granting summary judgment to the defendant. *Id.*  In doing so, however, the *Teneyuca* Court stated, "This is not to say that as a matter of law a plaintiff could never demonstrate that material facts exist such that summary judgment would be inappropriate in another similar case against this or another similar defendant. This Court holds only that in this case Teneyuca failed to demonstrate the presence of material factual issues so as to defeat the defendants' motion for summary judgment." *Id.*, at 153.

Several courts, including district courts in this Circuit, have applied the *Teneyuca* factors, or some derivative thereof, in addressing application of the personal staff exemption under § 2000e(f). *See Hemminghaus v. Missouri*, 756 F.3d 1100, 1108 (8th Cir. 2014); *Birch v. Cuyahoga Cty. Prob. Court*, 392 F.3d 151, 158 (6th Cir. 2004); *Nichols v. Hurley*, 921 F.2d 1101, 1110 (10th Cir. 1990); *Klymn v. Monroe Cnty. Supreme Ct.*, 641 F. Supp. 3d 6, 33-36 (W.D.N.Y. 2022), *reconsideration denied,* No. 21-CV-6488 (JLS), 2023 WL 5179191 (W.D.N.Y. Aug. 11, 2023); *Davis v. Town of Hempstead*, No. 14-CV-903 (JMA)(GRB), 2019 WL 235644, at *6–8 (E.D.N.Y. Jan. 16, 2019); *Croci v. Town of Haverstraw,* 175 F. Supp. 3d 373, 380-81 (S.D.N.Y. 2016);

*Smith v. Town of Hempstead*, 21 F.Supp.3d 202, 205 (E.D.N.Y.2014); *Bland*, 263 F.Supp.2d at 539–40.[11]

In *Bland*, one of the leading decisions on this issue, Judge Korman determined that an elected judge's confidential secretary, who alleged sexual misconduct by the judge, fell within the personal staff exception. Judge Korman found that **"**based on the language of the statute, its structure, and its legislative history, plaintiff [fell] within the terms of the exemption for an elected official's personal staff." *Bland*, 263 F. Supp. 2d at 539.

Judge Korman also found "[a]n examination of the six factors set out in *Teneyuca* under the present circumstances lends further support to the conclusion that Ms. Bland was a member of" the judge's personal staff. *Id.* at 540.  In this regard, the facts indicated as follows: that the elected judge had plenary statutory authority to appoint plaintiff or remove her from the secretarial position at issue; that the plaintiff "was wholly and solely responsible to" the elected judge in the performance of her job duties; that the elected judge "had complete control over the position and [the plaintiff's] responsibilities; that the plaintiff was personally supervised by the elected judge "without any intermediaries;" that, by answering the elected judge's phone and attending his chambers, the plaintiff represented the elected judge in the eyes of the public; and that, under the circumstances, the plaintiff "possessed an intimate and sensitive working relationship with" the elected judge.  *Id*.

---

[11] *See also Clews v. Cnty. of Schuylkill*, 12 F.4th 353, 360–63 (3d Cir. 2021) ("To be clear, our two-themed approach does not do away with a court considering the factors in *Teneyuca*. To the extent they are relevant to one or both parts of our approach, they should be considered in deciding if an individual is a member of the elected official's personal staff. If there is no genuine issue of material fact as to the applicability of the relevant themes and their application is so one-sided that no reasonable jury could disagree with the result, summary judgment is appropriate. Otherwise, it is not.") (internal quotation marks and citation omitted).

Judge Korman rejected the contention that factual issues prevented application of the personal staff exemption in that case, *id.*, at 544,[12] and dismissed the Title VII claim as against all parties "because plaintiff is not an 'employee' for the purpose of Title VII." *Id.*, at 557.

Similarly, in *Klymn,* Judge Sinatra found that the plaintiff, while serving as an elected judge's secretary, "fit the definition of 'personal staff' set forth in the statute." *Klymn*, 641 F. Supp. 3d at 33.   Consequently, Judge Sinatra ruled that "Plaintiff's Title VII claims against [UCS, OCA, and the Office of the Managing Inspector General for Bias Matters (the "State Court Defendants")] [were] dismissed to the extent they [arose] out of her employment as a secretary to [the elected judge]." *Id.*  In so ruling, Judge Sinatra stated in a footnote as follows:

---

[12]

Judge Korman wrote as follows:

Plaintiff also suggests that, at this juncture, this issue is one of fact rather than one of law, and not properly decided on these cross-motions to dismiss and for summary judgment. Indeed, in *Manzi v. DiCarlo,* 62 F.Supp.2d 780, 790, citing *Teneyuca,* I recognized the fact-intensive nature of the determination of whether an individual falls within the personal staff exemption where the scope of the exemption and the facts were uncertain. . . .

That being said, in the present case there are no issues of fact with regard to the question to be resolved on the motion. It is proper to take notice of the applicable statutes and administrative materials under which the plaintiff was appointed and performed her job, *see Teneyuca v. Bexar County,* 767 F.2d 148, 151 (5th Cir.1985) (unrefuted affidavit from defendant about job duties could be considered on motion to dismiss or in the alternative for summary judgment based on personal staff exemption); in addition, there is no material issue of fact as to what plaintiff's job responsibilities were. Even accepting plaintiff's representation that further evidence will show that her job responsibilities were entirely and exclusively ministerial, typing personal and court documents, and answering phones in chambers, no issue of fact exists as to whether she should be viewed as a member of an elected official's "personal staff." *See, e.g., EEOC v. Reno,* 758 F.2d at 584 (upholding grant of motion to dismiss that plaintiff was not "employee" within meaning of personal staff exemption to statute; court based its holding primarily on duties of the job as defined by statute); [*Butler v. New York State Dept. of Law,* 211 F.3d 739, 748-49 (2d Cir.2000)] (holding that court need not accept Deputy Attorney General's testimony and look beyond description of position in order to find an "intimate" working relationship with State Attorney General for purposes of policy making exemption under § 2000e(f)); *Teneyuca,* 767 F.2d at 152 (where statutory duties of office were clear, judgment could be granted on the pleadings and affidavit of defendant, despite fact-based nature of inquiry).

*Bland*, 263 F. Supp. 2d at 544.

24

> The Court rejects Plaintiff's argument that—notwithstanding the personal
> staff exemption—the State Court Defendants can be liable under Title VII for
> failing "to implement adequate sexual harassment training programs" or
> establishing "adequate avenues for complaint." *See* Dkt. 55, at 7 (quoting
> *Bland*, 263 F. Supp. 2d at 546.) In *Bland*, the Court expressly stated that,
> "[b]ecause plaintiff falls within the personal staff exemption, and therefore
> cannot bring suit under Title VII" the Court "need not discuss the parties'
> various alternative arguments relating to their potential liability under Title
> VII." *Bland*, 263 F. Supp. 2d at 545. The Court addressed those arguments
> only "for the sake of completeness." *Id.* Because Plaintiff cannot bring suit
> under Title VII insofar as she was [the elected judge's] secretary, it is
> irrelevant whether the State Court Defendants were joint employers with [the
> elected judge] before he resigned.

*Id.*, at 33, n. 16.

Here, in opposition to UCS's motion, Plaintiffs implicitly concede they were on

Miller's personal staff, at least when they worked directly with Miller from January 2015

through July 2017.[13]  Moreover, in responding to Miller's motion, Plaintiffs admit that

they were Miller's personal appointees from January 2015 until July 2017.[14]

While Plaintiffs acknowledge the *Bland* holding, they contend that their case

"draws several distinctions from *Bland*, most importantly, the judge [the plaintiff] was

working for terminated her in response to her E.E.O.C. complaint." Pls. Mem. L. in Opp.

to USC Mot., at 9.  Plaintiffs argue,

---

[13]

　　*See* Pls. Mem. L. in Opp. to UCS Mot., at 1 ("Plaintiffs acknowledge that they were selected by
defendant Richard Miller, II  . . . to work for him at Broome County Family Court, but their status as
personal appointees changed once Judge Miller was reassigned and no longer a sitting judge at Broome
County Family Court and could no longer be considered personal appointees after he was removed from
the bench by the Commission on Judicial Conduct."); *id.* at 8 ("Under the Fifth Circuit's non-exhaustive list
of factors, plaintiffs stopped meeting the criteria of personal appointees after Judge Miller was reassigned
in July 2017 and even more so when he was removed from the bench in February 2020.").

[14]

　　*See* Pl. Resp. to Miller Stat., ¶ 22 (Admitting that they were Miller's personal appointees "as to the
timeframe of January 1, 2015 to July 2017," but denying they were Miller's personal appointees "as to the
timeframe *after* July 2017," and contending that they "were employees or *de facto* employees of UCS and
no longer personal appointees of Judge Miller *after* he was reassigned in July 2017.") (emphases added)
(citing Gallagher Decl., ¶¶ 12-24, 29; Kachadourian Decl., ¶¶ 12-24, 28).

> As to the first [*Teneyuca*] factor, plaintiffs acknowledge that Judge Miller selected them to work as his secretary and court attorney, but they were terminated by defendant UCS long after Judge Miller's removal, and not by Judge Miller.  As to all of the remaining factors, plaintiffs had no further accountability to Judge Miller once he was reassigned in July 2017. Gallagher Decl., ¶¶ 15-20, Kachadourian Decl., ¶¶ 15-20.  Approximately three and half years passed when they did not perform any work for Judge Miller before their termination. Instead, they performed work for Broome County Family Court clerk's office, for other court attorneys, or other judges. *Id.* After 2017, Judge Miller did not exercise any control over their positions, nor did they have any working relationship with him. Defendant UCS's SOF, ¶ 22. Instead, they reported to the Chief Clerk or District Executive, who approved their timesheets, gave them performance reviews, directed their lunch breaks, and approved vacation and sick time. Gallagher Decl., ¶¶ 16-19, Kachadourian Decl., ¶¶ 16-19. Thus, the nature and circumstances of the plaintiffs' employment was primarily directed by defendant UCS. Under this analysis, a material question of fact remains as to whether plaintiffs were personal appointees of Judge Miller under Title VII. Therefore, defendant UCS's Motion for Summary Judgment should be denied.

*Id.*  The Court is not persuaded by Plaintiffs' arguments, at least as they pertain to the period between January 2015 and July 2017 when Plaintiffs ceased working directly with Miller.[15]

### January 2015 to July 2017

From January 2015 until July 2017, Plaintiffs qualified as Miller's personal staff within the meaning of 42 U.S.C. § 2000e(f).  During this time, the undisputed facts indicate that Miller had plenary authority to appoint  or remove them from their positions (although Miller purportedly lost the authority to remove them once the Inspector General's investigation began in July 2017); Plaintiffs were wholly and solely responsible to Miller in the performance of their job duties; Miller had

---

[15]    Plaintiffs assert that "[i]n or around June or July 2017," UCS reassigned them to work in the Sixth Judicial District office and thus separated them from Miller.  Gallagher Decl., ¶ 12; Kachadourian Decl., ¶ 12. The precise date of when this occurred is not clear from the material presented to the Court.  But there is little dispute that Plaintiffs ceased working directly for Miller sometime around the end of June or early July 2017.  For purposes of the pending motions, the Court will use July 2017 as the separation date. The precise date of separation can be established at trial.

complete control over their positions and responsibilities; Miller personally
supervised and evaluated them; Plaintiffs performed functions (including answering
Miller's phone, manning Miller's chambers, and meeting with attorneys appearing
before Miller) that represented Miller in the eyes of the public; and, under these
circumstances, Plaintiffs possessed an intimate and sensitive working relationship
with Miller.

To the extent that Plaintiffs argue that, from January 2015 until July 2017, UCS
was their *de facto* or indirect employer and therefore they escape § 2000e(f)'s personal
staff exemption, the argument is rejected.  As indicated above, from January 2, 2015
until July 2017, there is no genuine dispute that Plaintiffs fell within § 2000e(f)'s
personal staff exemption.  Section 2000e(f)'s legislative history indicates Congress's
intent to exclude certain categories of individuals, including elected officials' personal
staffs, as employees for purposes of Title VII coverage.  Nevertheless, excluded
individuals are not left without recourse to obtain relief. "As part of the Civil Rights Act of
1991, Congress enacted the Government Employee Rights Act of 1991 ("GERA"). The
GERA ameliorates the consequences to individuals of falling within certain of [§
2000e(f)'s] exemptions." *Kelley v. City of Albuquerque*, 542 F.3d 802, 808, n. 4 (10th
Cir. 2008) (citing Civil Rights Act of 1991, 42 U.S.C. § 2000e–16a *et seq*.). The GERA
"confers Title VII rights on those individuals covered by exemptions 2, 3, and 4 [of §
2000e(f)], but not on the elected official herself." *Id.* (citing 42 U.S.C. § 2000e–16c(a); 1
Mark A. Rothstein, Charles B. Craver, Elinor P. Schroeder & Elaine W. Shoben,
*Employment Law* § 2.5, at 177 (3d ed. 2004) (noting that the GERA "extended the
coverage of the Act to all except elected officials")); *see Bd. of Cnty. Comm'rs, Fremont*

*Cnty., Colorado v. U.S. E.E.O.C.*, 405 F.3d 840, 844 (10th Cir. 2005) ("In 1991, Congress enacted GERA, and extended protections against discrimination to previously exempt state employees. In so doing, Congress echoed the exclusionary language of Title VII, specifically extending protections against discrimination based on race, color, religion, sex, national origin, age, or disability to previously exempt high-level state employees.") (footnotes omitted).

"'[T]he procedures [that covered] employees must follow to obtain relief [under the GERA] differ considerably from those ordinarily available under Title VII.'" *Kelley*, 542 F.3d at 808, n. 4  (quoting 1 Lex K. Larson, *Employment Discrimination* § 4.06[1], at 4–32 (2d ed.2008)). "The individual may file a discrimination claim with the EEOC, and if the EEOC determines that a violation has occurred, it may provide appropriate relief." *Id.* (citing 42 U.S.C. § 2000e–16c(b)(1)).  "A party aggrieved by the EEOC's action may seek judicial review in the federal circuit courts." *Id.* (citing 42 U.S.C.§ 2000e–16c(c); *Employment Law, supra,* § 2.5, at 177 ("Review is to a federal court of appeals.... This provision is a dramatic departure from Title VII procedure, which provides for de novo review in a federal district court."); *Crain v. Butler,* 419 F.Supp.2d 785, 788 (E.D.N.C. 2005) ("Because the GERA mandates that a plaintiff first seek administrative relief with the EEOC and then appeal any adverse administrative decision to the United States Court of Appeals, this court is without jurisdiction to hear [plaintiff's] retaliation claim if it is governed by the GERA rather than Title VII.")).  "[D]istrict courts lack jurisdiction to hear claims covered by GERA." *Fischer v. New York State Dep't of L.*, 2014 WL 12674462, at *1 (S.D.N.Y. June 20, 2014) (citing cases).

It would be an impermissible end run around the GERA, and circumvent Congress's intent in enacting 42 U.S.C. § 2000e(f) and the GERA, to allow Plaintiffs to proceed in this Court against UCS on their Title VII claims arising from circumstances occurring while they served as Miller's personal staff  from January 2, 2015 until July 2017.  The Court agrees with Judge Sinatra's reasoning that, because Plaintiffs cannot bring suit under Title VII insofar as they served as Miller's Judicial Secretary and Court Attorney, it is irrelevant whether UCS was the *de facto* or indirect employer with Miller before he was reassigned and eventually removed from the bench. *See Klymn*, 641 F. Supp. 3d at 33, n. 16.

Accordingly, USC's motion is granted in part.  Plaintiffs' Title VII claims against USC are dismissed to the extent the claims arise out of circumstances occurring while Plaintiffs served as Miller's Judicial Secretary and Court Attorney from January 2, 2015 until July 2017 when they stopped functioning in these roles.[16] *Cf. Edelstein v. Stephens*, No. 1:17-CV-305, 2021 WL 4946685, at *1 (S.D. Ohio Feb. 22, 2021) ("Because Plaintiff is a member of an elected official's personal staff, she is protected by the Government Employee Rights Act of 1991 ('GERA') rather than Title VII of the Civil Rights Act of 1964.").

**July 2017 to December 31, 2021**

---

[16] The facts presented with the two (2) motions appear to indicate, even when construed in the light most favorable to Plaintiffs, that Miller's sexual harassment and Plaintiffs' complaints about that conduct occurred before they were separated from Miller in July 2017.  Thus, although not specifically argued by UCS, it would appear Plaintiffs cannot maintain Title VII sexual harassment claims against UCS for failing to establish adequate avenues for complaint or for failing to adequately respond to Plaintiffs' complaints to Singer. *See Kotcher v. Rosa & Sullivan Appliance Ctr., Inc.*, 957 F.2d 59, 63 (2d Cir. 1992) (An employer can be liable under Title VII for sexual harassment when the employer "provided no reasonable avenue for complaint or knew of the harassment but did nothing about it."). Nevertheless, because UCS did not specifically address this issue, and because there is the possibility of complaints made after the July 2017 separation, the Court offers no opinion on this issue.

A different conclusion is reached for claims arising from conduct occurring after Plaintiffs stopped working directly with Miller.  UCS contends it deemed Plaintiffs to be Miller's personal staff appointees until Miller lost his status as an elected judge. However, Plaintiffs continued their employment until December 31, 2021 even though they were separated from Miller in July 2017 and Miller was removed from the bench on October 15, 2020.  A question of material fact exists whether Plaintiffs can be deemed Miller's personal staff under § 2000e(f) after July 2017.

When the facts are viewed in the light most favorable to Plaintiffs, a reasonable factfinder could conclude that after July 2017, none of the *Teneyuca* factors other than that Miller appointed Plaintiffs to their positions could be satisfied. Indeed, after July 2017, the facts reasonably indicate that Plaintiffs reported to and were supervised by UCS personnel other than Miller; Plaintiffs performed work for UCS personnel other than Miller; Plaintiffs were evaluated by UCS personnel other than Miller; Plaintiffs had no further accountability to Miller; Miller lacked control over Plaintiffs' duties and positions; Plaintiffs were not in positions representative of Miller in the eyes of the public; and there did not exist an intimate working relationship between Plaintiffs and Miller. That being the case, Plaintiffs would not qualify as Miller's personal staff under § 2000e(f) during this period and, by extension, the GERA would not apply.  Thus, the Court must determine whether the facts reasonably support a conclusion that Plaintiffs qualified as UCS employees for Title VII purposes after July 2017. The Court finds that they do.

As Judge Sinatra stated in *Klymn,*

> In the Second Circuit, a "primary element of Title VII claims" is "the existence of an employer-employee relationship." *Felder v. United States Tennis Ass'n*, 27 F.4th 834, 838 (2d Cir. 2022) (quoting *Gulino v. N.Y.S. Educ. Dep't*, 460 F.3d 361, 370 (2d Cir. 2006)).
>
>  . . .
>
> An entity is an employer under Title VII where the entity "significantly affects the access of the individual to employment opportunities" through the "authority to hire or fire [the plaintiff], to supervise her work or conditions of employment, to determine her rate or method of pay, or to maintain records of her employment." *Kern v. City of Rochester*, 93 F.3d 38, 45 (2d Cir. 1996). The "principal guidepost" is the "common-law element of control." *Girard v. Int'l Ass'n of Approved Basketball Offs., Inc.*, 840 F. App'x 635, 638 (2d Cir. 2021) (quoting *Clackamas Gastroenterology Assocs., P.C. v. Wells*, 538 U.S. 440, 123 S.Ct. 1673, 155 L.Ed.2d 615 (2003)).

*Klymn*, 641 F. Supp. 3d at 34.

 Other than based on the fact that, by operation of N.Y. Jud. L. § 36(2), UCS did not have the authority to discharge Plaintiffs until December 31, 2021, a reasonable factfinder could conclude that after July 2017, UCS fulfilled all other functions of an employer including the common-law element of control.  Indeed, N.Y. Jud. L. § 36(2) provides that "[u]ntil [a former judge's] vacancy is filled, the chief administrator of the courts shall determine the functions to be performed by [the former judge's] personal assistants."  Examining the facts in the light most favorable to Plaintiffs, this appears to be what occurred here.  Under these circumstances, UCS's motion is denied to the extent Plaintiffs bring Title VII claims against UCS based on circumstances occurring after they were separated from Miller in July 2017.[17]

### B.    Miller's Motion

---

[17]     For reasons discussed in the previous footnote, the Court offers no opinion whether Plaintiffs' Title VII claims against UCS are limited to their retaliation claims. Further, even if this is the case, the Court offers no opinion whether Plaintiffs' have legally viable Title VII retaliation claims against UCS inasmuch as this issue is not addressed in UCS's motion.

Miller moves for summary judgment on all claims against him, which Plaintiffs oppose in part. The Court will address the parties' arguments in turn.

## Title VII  Claims
### (First and Second Causes of Action)

Plaintiffs concede that Miller cannot be individually liable under Title VII. *See* Pls. Mem. L. in Opp. Miller Mot., ECF 170, at 1, n.1 ("Plaintiffs do not oppose Defendant Miller's Motion for Summary Judgment with respect to their Title VII claims (First and Second Causes of Action) as they relate to him as an individual defendant but retain their Title VII claims against defendant the Unified Court System of the State of New York.").  Therefore, Plaintiffs' Title VII claims against Miller are dismissed.

## Equal Protection and NYSHRL Sexual Harassment Claims
### by Kachadourian
### (Third and Seventh Causes of Action)

Plaintiffs also concede that Kachadourian does not assert viable sexual harassment claims under §1983 or the NYHRL because he is unable to show that he was discriminated against based on his gender.  *See id.*, at 6 n. 2 ("Male plaintiff Mark Kachadourian acknowledges that because the Section 1983 Equal Protection claim requires a showing that he was discriminated based on his gender, this Cause of Action is limited to the female plaintiff, Rachelle Gallagher."); *id.*, at  9, n. 4 ("Male plaintiff Mark Kachadourian acknowledges that because the Section 1983 Equal Protection [sic] claim requires a showing that he was discriminated based on his gender, this Cause of Action is limited to the female plaintiff, Rachelle Gallagher.").[18] Therefore, the sexual

---

[18]
   Plaintiffs' footnote 4 is added in connection with Plaintiffs' discussion of the NYHRL hostile work environment claim. *See* ECF 170, at 9 ("Similar to the Section 1983 claim, plaintiff Rachelle Gallagher has produced evidence that she was subjected to a hostile work environment by Judge Miller on the basis of her gender . . . .").  Accordingly, the Court presumes that the reference to the "Section 1983 Equal Protection claim" in this footnote is a scrivener's error and that Plaintiffs concede that the NYHRL hostile work environment cause of action is limited to Gallagher's claim.

harassment claims under §1983 or the NYHRL, to the extent alleged by Kachadourian, are dismissed. *See Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002) ("[I]t is axiomatic that in order to establish a sex-based hostile work environment under Title VII, a plaintiff must demonstrate that the conduct occurred because of her sex.") (internal quotation marks omitted).

Gallagher's § 1983 Equal Protection Clause Claim
(Third Cause of Action)

Miller moves to dismiss Gallagher's § 1983 Equal Protection claim on several grounds, which the Court discusses *seriatim*.

**Used to Gain Advantages Not Available Under Title VII**

First, Miller argues that the claim should be dismissed because it is being used "to gain perceived advantages not available to a Title VII claimant." Miller Mem. L., ECF 156-17, at 5 (citing *Saulpaugh v. Monroe Cmty. Hosp*., 4 F.3d 134, 143 (2d Cir. 1993)). Miller's motion in this regard is denied.  "A plaintiff cannot use Section 1983 to gain perceived advantages not available to a Title VII claimant, but a plaintiff can assert a claim under Section 1983 if some law other than Title VII is the source of the right alleged to have been denied." *Saulpaugh,* 4 F.3d at 143.

Here, Gallagher claims a violation of her rights protected under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. *See* Compl. ¶¶ 109-12.  Because the source of the right alleged to have been denied arises from authority other than Title VII, Gallagher is entitled to proceed on this claim*. See Wilhelm v. Eden Cent. Sch. Dist.*, No. 17-CV-01327SI(F), 2020 WL 8366165, at *15–16 (W.D.N.Y. Aug. 11, 2020), *report and recommendation adopted,* 2021 WL 308117

(W.D.N.Y. Jan. 28, 2021) ("'A Title VII plaintiff is not precluded from bringing a § 1983 cause of action,' such as a claim for denial of equal protection, 'so long as the § 1983 claim is based on a distinct violation of a constitutional right.'") (quoting *Gierlinger v. New York State Police*, 15 F. 3d 32, 34 (2d Cir. 1994), and citing *Saulpaugh*, 4 F.3d at 143).

### Eleventh Amendment Sovereign Immunity

Second, Miller argues that Gallagher's § 1983 claim should be dismissed because it is barred by Eleventh Amendment sovereign immunity. *See* Miller Mem. L., at 5-6.  The motion in this regard is granted in part and denied in part.  "The immunity to which a state's official may be entitled in a § 1983 action depends initially on the capacity in which he is sued." *Ying Jing Gan v. City of New York*, 996 F.2d 522, 529 (2d Cir. 1993). "To the extent that a state official is sued for damages[19] in his official capacity, such a suit is deemed to be a suit against the state, and the official is entitled to invoke the Eleventh Amendment immunity belonging to the state." *Id.* (citations omitted).  "As to a claim brought against him in his individual capacity, however, the state official has no Eleventh Amendment immunity." *Id.* (citations omitted).

Plaintiffs do not directly address Eleventh Amendment immunity, but argue that "[i]ndividuals in their personal capacities are properly named as defendants under [§ 1983] for sexual discrimination or harassment when . . . the individual is a supervisor for a public employer and was acting under the color of state law." Pl. Mem. L. in Opp. to Miller Mot., at 5.  Despite the fact that the Complaint alleges that Miller is sued in both his official and individual capacities, Plaintiffs have clearly abandoned any § 1983 claim

---

[19] Plaintiffs' Complaint "seeks only monetary damages, and thus, *Ex Parte Young* is inapplicable." *Roosa v. Ochs*, 10-cv-433, 2010 WL 2773532, * 1 n.1 (N.D.N.Y. July 12, 2010) (citations omitted).

against Miller in his official capacity.  Even if not abandoned, any claim against Miller in his official capacity is barred by Eleventh Amendment sovereign immunity. *See Ying Jing Gan*, 996 F.2d at 529.  Accordingly, any § 1983 against Miller in his official capacity is dismissed.[20]  However, because Eleventh Amendment immunity does not apply to the § 1983 claim against Miller in his individual capacity, the motion in this regard is denied.

### Adverse Employment Action

Third, Miller argues that Gallagher's § 1983 claim should be dismissed because she was not subjected to any adverse employment action. *See* Miller Mem. L at 10.  In this regard, Miller contends that it is undisputed that Gallagher remained employed with UCS after Miller was reassigned. *Id.* (citing Miller Stat., ¶¶ 102-05; N.Y. Jud. L § 36(2)).  Plaintiffs counter that, "[u]nder any objective or subjective standard, [Miller's] sexual harassment had the purpose of unreasonably interfering with Ms. Gallagher's work performance or creating an intimidating, hostile, or offensive working environment."  Pls. Mem. L. in Opp. Miller Mot., at 7.

The adverse employment action for purposes of a hostile work environment claim is the hostile work environment itself. *See Rother v. NYS Dep't of Corr. & Cmty. Supervision*, 970 F. Supp. 2d 78, 92 (N.D.N.Y. 2013) ("A hostile work environment constitutes an adverse employment action.") (citing *Alfano,* 294 F.3d at 373). As discussed below, Gallagher presents facts upon which a reasonable factfinder could

---

[20] Because the Court dismisses the §1983 claim against Miller in his official capacity, it need not examine whether Miller's acts were performed pursuant to a municipal policy or custom. *See Patterson v. County of Oneida, New York,* 375 F.3d 206, 226 (2d Cir. 2004) ("[W]hen the defendant sued for discrimination under . . . § 1983 is . . . an individual sued in his official capacity, the plaintiff is required to show that the challenged acts were performed pursuant to a municipal policy or custom."); *cf. Sotak v. Bertoni*, 501 F. Supp. 3d 59, 82 (N.D.N.Y. 2020("[A] § 1983 hostile work environment claim depends on a showing that (1) one or more of the individual defendants were actually 'personally involved' in the misconduct that altered the plaintiff's working environment; and (2) that the conduct at issue was a 'but-for' cause of the hostile environment.") (citing *Naumovski*, 934 F.3d at  222; *Raspardo*, 770 F.3d at 115).

conclude that she was subjected to an actionable hostile work environment.  Thus, the motion on this ground is denied.

### Severe or Pervasive Comments or Conduct

Fourth, Miller argues that Gallagher fails to establish an actionable hostile work environment claim because, *inter alia*, she fails to establish that "'the workplace [was] permeated with discriminatory intimidation, ridicule, and insult that [was] sufficiently severe or pervasive to alter the conditions of the victim's employment and create a hostile working environment.'" Miller Mem. L., at 10 (quoting *Olin v. Rochester City Sch. Dist*., 596 F. Supp.3d 475, 487 (W.D.N.Y. 2022)) (additional citations omitted). Plaintiffs contend that Gallagher presents sufficient facts supporting an actionable §1983 sex-based hostile work environment claim to survive summary judgment.  The Court agrees with Plaintiffs.

Section 1983 authorizes private suits against any "person who, under color of any statute, ordinance, regulation, custom, or usage of any State ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. "Sex-based discrimination in public employment is actionable under § 1983 as a violation of the Equal Protection Clause of the Fourteenth Amendment, which protects 'public employees from various forms of discrimination, including hostile work environment ... on the basis of gender.'" *Legg v. Ulster Cnty.*, 979 F.3d 101, 116 (2d Cir. 2020) (quoting *Demoret v. Zegarelli*, 451 F.3d 140, 149 (2d Cir. 2006)); *see Naumovski v. Norris*, 934 F.3d 200, 212 (2d Cir. 2019) ("A plaintiff who claims sex discrimination in

public employment in violation of the Fourteenth Amendment may bring suit pursuant to § 1983.").

Miller does not dispute that he acted under color of state law while he served as Plaintiffs' direct supervisor. Thus, the pertinent question is whether his alleged conduct, if true, is sufficient to establish an actionable hostile work environment. "The threshold standard for proving a hostile work environment claim is generally the same for both Title VII and § 1983." *Legg*, 979 F.3d at 116 (quoting *Demoret*, 451 F.3d at 149 ("Once action under color of state law is established, the analysis for such claims is similar to that used for employment discrimination claims brought under Title VII ....")); *see Sotak v. Bertoni*, 501 F. Supp. 3d 59, 76 (N.D.N.Y. 2020) ("Equal Protection-based § 1983 claims for sex discrimination 'parallel Title VII discrimination claims in many respects.'") (quoting *Naumovski*, 934 F.3d at 212). "To establish a hostile work environment claim ... a plaintiff must show that the 'workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Raspardo v. Carlone*, 770 F.3d 97, 114 (2d Cir. 2014) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (internal citations and quotation marks omitted)).

"The standard contains both 'objective and subjective components: the conduct complained of must be severe or pervasive enough that a reasonable person would find it hostile or abusive, and the victim must subjectively perceive the work environment to be abusive.'" *Olin*, 596 F. Supp. 3d at 487 (quoting *Raspardo,* 770 F.3d at 114). "In determining whether a work environment meets the standard, courts must 'consider the totality of the circumstances, including 'the frequency of the discriminatory conduct; its

severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Id.* (quoting *Raspardo*, 770 F.3d 97 at 114, in turn quoting *Harris*, 510 U.S. at 23).

> As a general rule, incidents must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive. Isolated acts, unless very serious, do not meet the threshold of severity or pervasiveness. But it is well settled in this Circuit that even a single act can meet the threshold if, by itself, it can and does work a transformation of the plaintiff's workplace. In short, a plaintiff alleging a hostile work environment must demonstrate either that a single incident was extraordinarily severe, or that a series of incidents were sufficiently continuous and concerted' to have altered the conditions of her working environment.

*Alfano*, 294 F.3d 374 (internal quotation marks and citations omitted).

Miller argues that Gallagher's hostile work environment claims should be dismissed because Referee Barrer found as follows: that Plaintiffs' allegations underlying charges in the CJC complaint, which similar if not identical to those alleged here, were not credible; that discovery in this action did not corroborate many of these allegations; that Plaintiffs were the only individuals to corroborate most of the alleged conduct; that Plaintiffs admitted that they talked regularly even after they stopped working for Miller; and that the Chief Clerk characterized Plaintiffs as having often "overreacted" and frequently "rehashed" the same issues in multiple visits to her office. Miller Mem. L., at 10-14. Plaintiffs counter as follows: that credibility determinations are jury functions; that Referee Barrer's assessments of Plaintiff's claims should have no preclusive effect on this motion; and that Gallagher's Equal Protection cause of action is based on sufficient evidence in the record. *See* Pl. Mem. L. in Opp. Miller Mot., at 3-7. The Court agrees with Plaintiffs on these issues.

It is axiomatic that "[c]redibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of the judge, whether he is ruling on a motion for summary judgment or for a directed verdict." *Anderson*, 477 U.S. at 255.   While a plaintiff's credibility may be vulnerable to attack, that it is an issue for trial, not summary judgment. *See Dervisholli v. Triangle Gen. Contractors, Inc.*, No. 12-cv-4412, 2016 WL 6902135, at *4 (E.D.N.Y. Nov. 22, 2016); *Juarez v. Wheels Pizza, Inc.*, No. 13-cv-261, 2015 WL 3971732, at *3 (S.D.N.Y. June 30, 2015).   Although Referee Barrer appears to have done a thorough job analyzing the charges before him, it will be for the jury to assess Plaintiffs' and the other witnesses' credibility, to weigh the evidence, and to draw legitimate inferences and conclusions from the facts presented in this case.   Indeed, even on Miller's petition to the New York State Court of Appeals, the Court stated that, "[w]ith respect to the Commission's factual findings, it is well settled that '[n]either the Commission nor this Court is bound to accept the Referee's findings.'" *Matter of Miller*, 35 N.Y.3d at  489 (quoting *Matter of Marshall*, 8 NY3d 741, 743 (NY 2007)).   By the same reasoning, the Court is not bound to accept Referee Barrer's findings in ruling on the summary judgment motions.

Further, Gallagher has presented evidence upon which a reasonable factfinder could conclude that her work environment, while working directly with Miller, was both objectively and subjectively hostile.   There can be no dispute that Gallagher perceived the work environment to be abusive based upon Miller's purported sex-based comments made to Gallagher or within her earshot.   A reasonable factfinder could conclude that, when viewed in their totality, Miller's sex-based comments were

sufficiently continuous and concerted such to have altered the conditions of her working environment.

Moreover, even assuming that a reasonable factfinder would conclude that Miller's comments were merely episodic and not pervasive, the same factfinder could conclude that isolated events – such as Miller demanding Gallagher satisfy a state senator's sexual needs – were extraordinarily severe such to transform Gallagher's workplace into a hostile or abusive work environment.  Miller's motion on this ground is denied.

### Miller's Comments/Conduct Based on Gallagher's Gender

Fifth, Miller argues that "[t]here is little, if any, evidence in the record to prove [that Miller's conduct] (if true) was motivated by unlawful sex-based animus." Miller Reply, ECF 173, at 6.  Miller maintains that, "while Plaintiffs have conceded Kachadourian cannot maintain a hostile work environment claim against Miller, they have not addressed the critical reality that, even if Miller made the enumerated comments, he subjected both a male and a female – Kachadourian and Gallagher – to similar graphic, crude, sexual comments, and threatening language." *Id.* Miller further maintains that "[n]othing in Plaintiffs' Complaint or their opposition demonstrates Miller treated the two plaintiffs differently, let alone based on their respective sex, a reality fatal to [the § 1983 and NYSHRL] hostile work environment claims." *Id.*

Miller's motion on this ground is denied. As a general matter pertinent to both the § 1983 and NYSHRL hostile work environment claims, many of Miller's alleged comments were made to, or within the earshot, of both Plaintiffs.  However, a reasonable factfinder could conclude that Miller's alleged comments were motivated by

considerations of Gallagher's gender.  For instance, Plaintiffs allege that Miller yelled at Gallagher and told her he wanted her to satisfy the sexual needs of a state senator. A reasonable factfinder could conclude that Miller was motivated by Gallagher's gender in making this comment.  The same conclusion could be reached as to Miller's alleged comments about Miller needing his own sexual needs satisfied.  While a jury might conclude that that Miller's comments lacked a gender-specific animus, that is an issue to be resolved at trial.

It is also important to note that "a § 1983 plaintiff does not benefit from the more generous causation standard found in Title VII." *Sotak*, 501 F. Supp. 3d at 77.  "'Under Title VII, a plaintiff may succeed simply by establishing that sex (or another protected characteristic) was the motivating factor for any employment practice, even though other factors also motivated the practice.'" *Id.* (quoting *Naumovski*, 934 F.3d at 213). "The same is not true of § 1983, which requires a plaintiff who brings a sex-based disparate treatment or hostile work environment claim to show that each defendant's discriminatory intent was a 'but-for' cause of the adverse employment action or the hostile environment." *Id.* (citing *Naumovski*, 934 F.3d at 214).

Because most of Miller's alleged comments were made to, or in the earshot of, both Plaintiffs, and because Miller's alleged harassing conduct (including showing or attempting to show sexually explicit pictures) seemingly involved both Plaintiffs, it may be difficult to convince a jury that Miller's gender-based discriminatory intent was a but-for cause of the hostile environment.  Nonetheless, the Court's function at this stage is merely to determine whether there is sufficient evidence for the hostile work environment claims to proceed. The Court finds that there is. Under the facts presented

by Plaintiffs, there is sufficient evidence for a reasonable factfinder to conclude that Miller's gender-based discriminatory intent was a but-for cause of Miller's comments and conduct resulting in a hostile work environment.

### Conclusion - §1983 Hostile Work Environment Claim

For the reasons discussed above, Miller's motion to dismiss the § 1983 hostile work environment claim is granted in part and denied in part.  The motion is granted in that any § 1983 claim against Miller in his official capacity is dismissed, and the motion is denied in that Gallagher's § 1983 claim against Miller in his individual capacity may proceed.

### Remaining NYSHRL Claims
### (Sixth and Seventh Causes of Action)

Remaining are Plaintiffs' NYSHRL Retaliation and Aiding and Abetting Retaliation claims against Miller (Sixth Cause of Action), and Gallagher's NYSHRL Aiding and Abetting Hostile Work Environment claim against Miller (Seventh Cause of Action). Miller moves to dismiss these claims on several grounds.

### Eleventh Amendment Sovereign Immunity

Miller argues that the NYSHRL claims must be dismissed because they are barred by Eleventh Amendment sovereign immunity.  For reasons discussed above relative to the same argument on the § 1983 claim, Miller's motion is granted to the extent he is sued in his official capacity and denied to the extent he is sued in his individual capacity. *See Matsko v. New York*, No. 5:18-CV-00857 (MAD/TWD), 2022 WL 137724, at *13 (N.D.N.Y. Jan. 14, 2022) ("It is well settled that suits against state agencies and state officers acting in their official capacities are functionally equivalent to suits against the State. Courts in the Second Circuit have consistently held that New

42

York State has not consented to be sued in federal court under the NYSHRL.") (internal

quotation marks and citation omitted), *appeal withdrawn,* No. 22-296, 2022 WL 1589390

(2d Cir. May 4, 2022).

### Miller as Plaintiffs' Employer on Retaliation Claims
### (Sixth Cause of Action)

The NYSHRL forbids discriminatory practices by an "employer." N.Y. Exec. L. §

296(1)(a). Miller contends that, to the extent Plaintiffs' Sixth Cause of Action for

retaliation is pled against him as an "employer," it must be dismissed as a matter of law.

The Court agrees.

> "Historically," federal courts applying the NYSHRL found that "liability for
> employment discrimination could be imposed on an individual 'if the
> individual qualifies as an "employer."'" *Belyea v. City of Glen Cove*, No. 20-
> CV-5675, 2023 WL 1929787, at *2–3 (E.D.N.Y. Feb. 10, 2023) (quoting
> *Bonaffini v. City Univ. of N.Y.*, No. 20-CV-5118, 2021 WL 2895688, at *2
> (E.D.N.Y. July 9, 2021)); *see also Townsend v. Benjamin Enters., Inc.*, 679
> F.3d 41, 57 (2d Cir. 2012) ("Under [the NYSHRL], an individual is properly
> subject to liability for discrimination when that individual qualifies as an
> 'employer.'" (quoting N.Y. Exec. Law § 296(1))); *Lore v. City of Syracuse*,
> 670 F.3d 127, 169 (2d Cir. 2012) ("Under the [NYSHRL] ... liability for
> employment discrimination may be imposed on individuals."). However, in
> *Doe v. Bloomberg, L.P.,* the New York Court of Appeals rejected this broader
> interpretation of the word "employer" under the NYSHRL, and clarified that
> the NYSHRL "does not render employees liable as individual employers." 36
> N.Y.3d 450, 458 (N.Y. 2021) (citing *Patrowich v. Chemical Bank*, 63 N.Y.2d
> 541, 543–44 (N.Y. 1984)); *accord Bueno v. Eurostars Hotel Co., S.L.*, No.
> 21-CV-0535, 2022 WL 95026, at *7 (S.D.N.Y. Jan. 10, 2022) ("Under a
> recent decision by the New York Court of Appeals, a corporate
> employee—even its owner and CEO—no longer qualifies as an 'employer'
> under [the New York City Human Rights Law and NYSHRL].")). Since 2021,
> some courts in the Second Circuit have extended *Bloomberg, L.P.*'s
> reasoning to the public employment context. *See, e.g., Stevenson v. N.Y.S.
> Dep't of Corr.*, No. 21-CV-0355, 2022 WL 179768, at *21 (W.D.N.Y. Jan. 20,
> 2022); *Bonaffini*, 2021 WL 2895688, at *2. Accordingly, under the "narrow
> meaning of employer under the [NYSHRL]," *Bloomberg, L.P.*, 36 N.Y.3d at

458, [defendants sued in their individual capacities] cannot be held individually liable as employers.  All three [individually sued defendants] are employees of the School District under New York state law and therefore were not Plaintiff's employer for the purposes of Plaintiff's NYSHRL claims. *Cf. Belyea*, 2023 WL 1929787, at *3.

*Milner-Koonce v. Albany City Sch. Dist.*, No. 1:21-CV-1271 (LEK/CFH), 2023 WL 3748831, at *6 (N.D.N.Y. June 1, 2023).

Miller argues that he never employed Plaintiffs, and points out that Plaintiffs have admitted they were employed by UCS.  Miller Mem. L., at 8 (citing Miller Stat., ¶ 23).  Plaintiffs counter that "defendants have affirmatively created a question of material fact . . . regarding who employed plaintiffs by virtue of each defendants' independent summary judgment motions." Pl. Mem. L. in Opp. Miller Mot., p. 7.  Plaintiffs' argument is unpersuasive.

UCS was sued only under Title VII, and in its motion asserted that, "because Plaintiffs are not employees of Defendant UCS *within the meaning of Title VII*, Defendant UCS is entitled to summary judgment on all of Plaintiffs' claims." UCS Mem. L., at 5 (emphasis added). UCS's limited argument concerning the definition of "employer" under Title VII concerned only Plaintiffs' claims against UCS under Title VII, not who employed Plaintiffs for the purposes of the NYSHRL. Thus, this distinction, in and of itself, does not create an issue of fact.

Similarly, to the extent Plaintiffs contend Miller was an employer under the NYSHRL because, they believe, he authorized or directed activities by other UCS personnel "in order to intimidate, frighten and alarm Ms. Gallagher in retaliation for reporting his harassment and abuse and prevent Plaintiffs from pursuing any further action related to Judge Miller's harassment and abuse,"  Pl. Mem. L. in Opp. Miller Mot.,

p. 8, the argument is rejected.  This is merely another way of arguing for the existence of aiding and abetting liability under the NYSHRL, which is discussed next.

### Aiding and Abetting Retaliation
### (Sixth Cause of Action)

The Sixth Cause of Action also alleges that Miller is liable under the NYSHRL for aiding and abetting the alleged retaliation. The NYSHRL provides that "[i]t shall be an unlawful discriminatory practice for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this article, or to attempt to do so." N.Y. Exec. Law § 296(6).  Miller argues that Plaintiffs have not sufficiently demonstrated that Miller aided and abetted the alleged acts of retaliation because Plaintiffs cite only to allegations in the Complaint. *See* Pl. Mem. L. in Opp. Miller Mot., p. 8.  In this regard, Miller asserts as follows:

> Those allegations (even if sufficient to defeat summary judgment – which they are not) do not even sufficiently allege let alone prove that Miller authorized or directed any of the activities. Plaintiffs point to alleged complaints made to the Chief Clerk, actions and inactions of UCS, "revisions by defendant UCS to the original Sexual Harassment Policy, resulting in less protections to plaintiffs," and "reassignment back to Broome County Family Court where [Plaintiffs] were given severely diminished duties and less desirable assignments." Pl. Br. 13.  On their faces alone, none of these allegations relate to actions that were authorized or directed by Miller. Indeed, there is no dispute that Miller had no knowledge of, let alone involvement in, receiving or responding to the alleged complaints made to the Chief Clerk, or revisions to UCS's policies and was not involved in and did not control Plaintiffs' reassignments. Miller Decl. ¶ 11; [Gallagher] Dep. 244:8 to 244:23; [Kachadourian] Dep. 259:22 to 260:11. Bare allegations of a complaint that were not proven during the lengthy discovery period of this case simply are not enough to defeat Miller's summary judgment motion.

Miller Reply at 5-6.  The Court agrees with Miller on this issue.

It is well settled that a party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials asserted in his pleadings, *Rexnord Holdings,* 21 F.3d at 525-26, or on conclusory allegations or unsubstantiated speculation. *Scotto*, 143 F.3d at 114. In opposition to this aspect of Miller's motion, Plaintiffs rely only on the allegations asserted in the Complaint and on their unsupported speculation that Miller played some role in the allegedly retaliatory conduct or omissions by USC personnel. This is insufficient to withstand summary judgment. Therefore, Miller's motion is granted to the extent that the NYSHRL claims for aiding and abetting the alleged retaliation asserted in the Sixth Cause of Action are dismissed.

### Aiding and Abetting a Hostile Work Environment
### (Seventh Cause of Action)

The Seventh Cause of Action alleges that Miller is liable under the NYSHRL for aiding and abetting "the creation of [a] hostile workplace." Compl., ¶ 128. Miller argues that this claim must be dismissed because Plaintiffs refer to discriminatory intimidation, ridicule, and insult they experienced, but the only person they attribute such behavior to is Miller himself. Miller Mem. L., at 8. Miller contends that the claim is not legally viable because an individual cannot aid and abet their own discriminatory conduct. *Id.* Plaintiffs counter as follows:

> [P]laintiffs have demonstrated that they were subjected to an adverse employment action. Namely, their employment was terminated by defendant UCS on December 31, 2021. Additionally, plaintiffs have demonstrated sufficient evidence showing that they were given diminished work tasks, less desirable duties, and were subjected to intimidation and threats of violence within the courthouse. Gallagher Decl., ¶¶16, 25-27.

> Similar to the Section 1983 claim, plaintiff Rachelle Gallagher has produced evidence that she was subjected to a hostile work environment by Judge Miller on the basis of her gender, in that the nature of Judge Miller's derogatory comments were related to females and said comments . . . reflect

> a nexus between Ms. Gallagher's gender and sexually motivated behavior towards her. When viewed in the light most favorable to the plaintiff, defendant Miller's conduct were not vague or isolated incidents but amounted to both a subjectively and objectively hostile work environment.

Pls. Mem. L. in Opp. Miller Mot., at 9.

With respect to Plaintiffs' arguments that the hostile work environment arose because they were terminated by UCS, that they were given diminished work tasks and less desirable duties, and that they were subjected to intimidation and threats of violence within the courthouse, Plaintiffs fail to present anything beyond mere speculation that Miller played any role in these circumstances. Thus, to the extent Plaintiffs contend that Miller aided and abetted these circumstances, Miller's motion is granted.

With respect to Plaintiffs' argument that the hostile work environment arose because Miller subjected Gallagher to a gender-based hostile work environment, Miller's motion in this regard is granted.  As Miller argues, the only person Plaintiffs attribute such behavior to is Miller himself.  However, it is well settled that under the NYHRL an individual cannot aid and abet his own discriminatory conduct. *Boonmalert v. City of New York*, 721 Fed. Appx. 29, 34 (2d Cir. 2018) (unpublished) (citing *Strauss v. N.Y. State Dep't of Educ.*, 26 A.D.3d 67, 805 N.Y.S.2d 704, 709 (3d Dep't 2005) ("[W]e hold that individuals cannot be held liable under Executive Law § 296(6) for aiding and abetting their own violations of the Human Rights Law.")); *see, e.g., U.S. v. N.Y.C. Dep't of Educ.*, 407 F.Supp.3d 365, 402 (S.D.N.Y. 2018) (finding that, where plaintiffs had viable state law claims against only one person, and there was "no underlying violation by an individual other than" that person, "the aiding and abetting claims against her must also be dismissed"); *see also Kellman v. Met. Transp. Auth.*, 8 F.Supp.3d 351, 393

(S.D.N.Y. 2014) ("[A]n individual may not be held liable merely for aiding and abetting his own discriminatory conduct but only for assisting another party in violating that law.") (citations and internal quotations omitted)). Therefore, Miller's motion in this respect is granted and Plaintiffs' Seventh Cause of Action is dismissed.

### Intentional Infliction of Emotional Distress
### (Fourth Cause of Action)

Miller moves for summary judgment on the IIED claims, contending that Plaintiffs cannot satisfy the elements of such claims. Plaintiffs counter that they have presented sufficient evidence to withstand the motion on this ground.  For the reasons that follow, Miller's motion in this regard is granted .

> "Under New York law, a claim of intentional infliction of emotional distress requires: '(1) extreme and outrageous conduct; (2) intent to cause, or reckless disregard of a substantial probability of causing, severe emotional distress; (3) a causal connection between the conduct and the injury; and (4) severe emotional distress.'" *Conboy v. AT&T Corp.*, 241 F.3d 242, 258 (2d Cir. 2001) (quoting *Stuto v. Fleishman*, 164 F.3d 820, 827 (2d Cir. 1999)); *accord Endemann v. City of Oneida*, No. 5:19-CV-1444 (MAD/ATB), 2020 WL 1674255 *6, 2020 U.S. Dist. LEXIS 59792 *17 (N.D.N.Y. Apr. 6, 2020) (D'Agostino, J.). "'Whether the conduct alleged may reasonably be regarded as so extreme and outrageous as to permit recovery is a matter for the court to determine in the first instance.'" *Hendricks v. Cty. of Oneida*, No. 6:11-CV-0007 (GTS/ATB), 2013 WL 4106488 *8, 2013 U.S. Dist. LEXIS 113716 *22 (N.D.N.Y. Aug. 13, 2013) (Suddaby, J.) (quoting *Stuto*, 164 F.3d at 827 (citing *Howell* [*v. New York Post Co.*], 612 N.E.2d 699, 81 N.Y.2d [115,] 121, 596 N.Y.S.2d 350 [(N.Y. 1993)])). "Only where the alleged conduct 'has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society' will a court allow a claim for intentional infliction of emotional distress to go forward." *Id.* at *8, 2013 U.S. Dist. LEXIS 113716 *22-*23 ([*Stuto.* 164 F.3d] at 827 (quoting *Howell*, 612 N.E.2d 699, 81 N.Y.2d at 122, 596 N.Y.S.2d 350)). "'[I]n the employment context, th[os]e claims have been accompanied by allegations of sex discrimination, and more significantly, [sexual] battery.'" *Knight v. Cty. of Cayuga*, No. 5:19-CV-712, 2019 WL 5067901 *14, 2019 U.S. Dist. LEXIS 175238 *41 (N.D.N.Y.

Oct. 9, 2019) (Hurd, J.) (quoting *Gerzog v. London Fog Corp.*, 907 F. Supp. 590, 604 (E.D.N.Y. 1995) (collecting cases)). "As a result, 'federal courts applying New York law regularly dismiss claims for intentional infliction of emotional distress.'" *Id.* (quoting *Hendricks v. Cty. of Oneida*, 2013 U.S. Dist. LEXIS 113716, 2013 WL 4106488, at *15 (N.D.N.Y. Aug. 13, 2013)).

*Miles v. Pepsico*, No. 5:20-CV-1591 (FJS/TWD), 2022 WL 798272, at *3 (N.D.N.Y. Mar. 16, 2022); *cf.*, *Rosendale v. Mr. Cooper Group Inc.*, No. 19-CV-9263 (NSR), 2021 WL 4066821, at *21 (S.D.N.Y. Sept. 7, 2021) ("Because the claim of intentional infliction of emotional distress is so disfavored, a plaintiff must typically show that the defendant's conduct has been 'so extreme in degree' as to exceed 'all possible bounds of decency.'") (quoting *Murphy v. Am. Home Prods. Corp.*, 58 N.Y.2d 293, 303 (N.Y. 1983)).

Plaintiffs contend that the Court should be guided by *Sebastiani v. Lee*, No. 19-CV-3638 (PKC/ST), 2019 WL 5267289 (E.D.N.Y. Oct. 17, 2019), in resolving these claims.  There, Judge Chen held that, although the New York Court of Appeals has rarely allowed a plaintiff to sustain a claim for intentional infliction of emotional distress in an employment discrimination case, the plaintiff's allegation of defendant making a death threat against him, combined with the allegations of continued harassment and the defendant's guilty plea to violating plaintiff's Order of Protection, presented sufficient allegations to plausibly establish an IIED claim under New York law. *Id.*, at *3. Plaintiffs also point to cases that have recognized the legal viability of IIED claims involving death threats made during a long-term course of harassment and intimidation. *See Allam v. Meyers*, No. 09-CV-10580 (KMW), 2011 WL 721648, at *10–11 (S.D.N.Y. Feb. 24, 2011) (upholding IIED jury verdict based on a "five month-long, deliberate and malicious campaign of harassment and intimidation" that involved "threats of violence," death

threats, and "relentless humiliation and emotional abuse"); *Cavallaro v. Pozzi*, 814 N.Y.S.2d 462, 465–66 (N.Y. App. Div. 4th Dept. 2006) (deeming threat to "kill plaintiff and his children" in course of a "deliberate and malicious campaign of harassment or intimidation" sufficiently outrageous to warrant consideration by a jury).

Here, even accepting Plaintiffs' allegations as true and considering the totality of the circumstances, Plaintiffs fail to establish that Miller's conduct is sufficient to establish an IIED claim under New York law.  Examining the first element of such claims – extreme and outrageous conduct, *Conboy*, 241 F.3d at 258 – Miller's alleged sex-based comments and demands, by themselves, were not so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency such to be considered atrocious and utterly intolerable in a civilized society.  "So rigorous is [the appliable] standard that '[i]n the rare instances where the New York courts have found the complaint sufficient to state a claim for intentional infliction of emotional distress in the employment context, the claims have been accompanied by allegations of sex discrimination, and more significantly, [sexual] battery.'" *Knight v. Cnty. of Cayuga*, No. 5:19-CV-712, 2019 WL 5067901, at *14 (N.D.N.Y. Oct. 9, 2019) (quoting *Gerzog v. London Fog Corp.*, 907 F. Supp. 590, 604 (E.D.N.Y. 1995) (collecting cases)).  Miller's sex-based comments and demands, while unprofessional, impertinent and boorish, did not involve sexual battery.

Further, even if it can be deemed that Miller's conduct constituted a long-term course of harassment and intimidation, Miller's direct threats to Plaintiffs' safety do not change the results.  Miller's conduct in this regard amounted to veiled threats that Plaintiffs would be placed in cement shoes and drowned in the river if they ever

50

betrayed Miller, and that Miller's associates, who may have had some connection with organized crime, would take reprisals against Plaintiffs if they reported his harassment. *See* Compl. ¶¶ 47-56.  Although certainly unprofessional and disturbing, the Court is constrained to find that these threats – without more – do not meet the stringent standard set forth by the New York Court of Appeals in *Howell*, 81 N.Y.2d at 121.

Moreover, while Plaintiffs point to threatening conduct by third parties that had some tangential connection with Miller (i.e., a warning by another judge that one of Miller's associates had threatened Plaintiffs, an indication that a court employee whose nude picture Miller had circulated threatened Plaintiffs, and on two occasions permitting an attorney with ties to Miller into the restricted area for court personnel despite prior complaints about this conduct), these isolated events occurred in 2018 and thus were not part of an ongoing course of conduct by Miller to harass and intimidate Plaintiffs. Further, these third-party threats – even if considered part of an ongoing harassment and intimidation campaign by Miller – did not amount to conduct so extreme in degree as to exceed all possible bounds of decency.

Even when the facts are viewed in totality, Plaintiffs fail to present circumstances that arise to the level of severity necessary to establish the first element of an IIED claim.  "Although [Plaintiffs] . .  describe a discriminatory, hateful workplace, the Court finds that such verbal harassment, threats, and workplace interference are not so extreme as to go 'beyond all possible bounds of decency' so as to meet the standard for asserting IIED claims in the employment context. Such vile conduct should not be tolerated in the workplace, but it is not synonymous with physical or sexual assault,

which courts have found are so egregious that an IIED claim may stand." *Miles*, 2022 WL 798272, at *4.

Miller also argues that Plaintiffs fail to present sufficient evidence to satisfy the third and fourth elements of their IIED claims – a causal connection between the conduct and the injury, and severe emotional distress. *Conboy*, 241 F.3d at 258.  In this regard, Miller presents medical opinions from Dr. Jacqueline Bashkoff, Ph.D., based upon a review of relevant legal documents, medical reports, psychological records, in-person interviews of each of the Plaintiffs, and psychological testing. *See* Bashkoff Decl., ECF 159-2 (redacted); 164 (sealed); *see also* Defs' Expert Disclosure, ECF 159-3, Exs. A & B (Bashkoff's reports pertaining to each Plaintiff) (sealed).  Dr. Bashkoff concludes, within a reasonable degree of psychological certainty, that none of the psychological damages that Gallagher alleges resulted from sexual harassment or retaliation committed by Miller are supported by medical evidence. *See* ECF 159-2, at p. 4; 164, ¶ 18.  Dr. Bashkoff also found no evidence that Kachadourian suffers from any psychological damages causally related to the allegations he asserts against Miller. *See* ECF 159-2, ¶¶ 22-23; 164, ¶¶ 22-23.

Faced with this evidence, Plaintiffs contend as follows:

The sole reliance of defendant's expert, Dr. Jacqueline Bashkoff, to challenge plaintiffs' claims of emotional distress is insufficient to warrant summary judgment. Plaintiffs have produced medical authorizations and records related to Ms. Gallagher's mental health provider [that] were subpoenaed and obtained by defendant Miller. Furthermore, Ms. Gallagher's treating mental health provider was deposed during this action and provided testimony concerning plaintiff's ongoing treatment, diagnoses, and prognosis. Therefore, a material question of fact exists related to plaintiffs' emotional injuries, and summary judgment should be denied.

Pls. Mem. L. Opp. to Miller Mot., at 11.  Plaintiffs' argument is insufficient to withstand summary judgment on the IIED claim.

Plaintiffs have not presented any medical evidence related to Gallagher's mental health treatment, diagnosis, or prognosis.  Plaintiffs have also failed to present any medical evidence related to Kachadourian's mental health condition, treatment, diagnosis, or prognosis.  "Conclusory statements that Plaintiff suffered emotional distress are insufficient as a matter of law." *Benn v. City of New York*, No. 18 CIV. 722 (LGS), 2021 WL 3193022, at *6 (S.D.N.Y. July 28, 2021) (citing *Medina v. City of N.Y.*, No. 19 Civ. 9412, 2020 WL 7028688, at *14 (S.D.N.Y. Nov. 30, 2020), in turn citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Plaintiff must present medical evidence showing the effects of the emotional distress." *Benn,* 2021 WL 3193022, at *6 (citing *Roche v. Claverack Co-op. Ins. Co.*, 874 N.Y.S.2d 592, 597 (N.Y. App. Div. 3rd Dept. 2009) (collecting cases); *Blackwood v. Omorvan*, No. 16 Civ. 644, 2019 WL 4600662, at *8 (S.D.N.Y. Sept. 23, 2019)); *see*, *e.g.*, *Rosendale*, 2021 WL 4066821, at *21 (S.D.N.Y. Sept. 7, 2021) ("Any allegations of suffering from severe emotional distress must be supported with objective evidence and not speculative claims.") (collecting cases); *Walentas v. Johnes*, 683 N.Y.S.2d 56, 58 (N.Y. App. Div. 1st Dept. 1999) ("The plaintiff is required to establish that severe emotional distress was suffered, which must be supported by medical evidence, not the mere recitation of speculative claims.") (citations omitted).

Based on the record before the Court, Plaintiffs are unable to establish the third and fourth elements of their IIED claims.  Therefore, these claims are dismissed. *See Benn*, 2021 WL 3193022, at *6 ("Plaintiff cannot sustain his IIED claim against

Defendants. . . .  Plaintiff's conclusory claim of emotional distress is unsupported by any medical or other evidence except his own conclusory statements. Defendants' motion for summary judgment is granted on Claim Nine."); *Roche*, 59 A.D.3d  at 918 (affirming summary judgment dismissing IIED claim where plaintiff failed to present medical evidence of severe emotional distress) (collecting cases); *Cusimano v. United Health Servs. Hosps., Inc.*, 91 A.D.3d 1149, 1152 (3d Dep't 2012) (same).

### Negligent Infliction of Emotional Distress
### (Fifth Cause of Action)

Plaintiffs assert NIED claims in the Fifth Cause of Action, which Miller moves to dismiss. *See* Miller Mem. L. at 20.  "Under New York law, a plaintiff may establish a claim for negligent infliction of emotional distress under one of two theories: (1) the bystander theory; or (2) the direct duty theory, both of which require a threat or danger of physical harm." *Hendricks v. Cnty. of Oneida*, No. 6:11-CV-0007 GTS/ATB, 2013 WL 4106488, at *8 (N.D.N.Y. Aug. 13, 2013) (citation omitted). Miller correctly argues that, based on Plaintiffs' allegations, Plaintiffs necessarily proceed under a direct duty theory of liability. *Cf. id.* ("Under the bystander theory, a plaintiff may recover when (1) she is threatened with physical harm as a result of defendant's negligence; and (2) consequently she suffers emotional injury from witnessing the death or serious bodily injury of a member of her immediate family.") (internal quotation marks omitted).

"A plaintiff may recover under a direct duty theory when she suffers an emotional injury from defendant's breach of duty which unreasonably endangered her own physical safety." *Id.* (internal quotation marks omitted). "A breach of the duty of care resulting directly in emotional harm is compensable even though no physical injury occurred when the mental injury is a direct, rather than a consequential, result of the

54

breach and when the claim possesses some guarantee of genuineness." *Taggart v. Costabile*, 14 N.Y.S.3d 388, 396 (N.Y. App. Div. 2d Dept. 2015) (internal quotation marks omitted). "The [New York] Court of Appeals has . . . required that the mental injury be a direct, rather than a consequential, result of the negligence, and that the claim of emotional distress possess some guarantee of genuineness." *Id.* (internal quotation marks omitted).  "[T]he guarantee of genuineness generally requires that the breach of the duty owed directly to the injured party must have at least endangered the plaintiff's physical safety or caused the plaintiff to fear for his or her own physical safety." *Id.* (internal quotation marks omitted).

Miller argues that Plaintiffs' NIED claims must be dismissed for three reasons: (1) Plaintiffs "have not alleged any duty Mr. Miller must satisfy with respect to either of them that is not employment related;" (2) "Plaintiffs have not experienced any emotional injury arising as a direct result of the breach" (citing, *inter alia*, Dr. Bashkoff's Report); and (3) "[t]he only fear for their physical safety Plaintiffs 'experienced' resulted from Mr. Miller's alleged connections to 'unsavory' people, a statement about betrayal by a friend, and two statements concerning cement boots, none of which came to fruition, and none of which even prompted Plaintiffs to go to the police." Miller Mem. L. at 20.  Thus, Miller contends, "Plaintiffs cannot establish a single element of their NIED claim, and it should be dismissed." *Id.*

Plaintiffs do not specifically oppose this aspect of Miller's motion. *See* Pls. Mem. L. Opp. Miller Mot., at 10-11 (addressing only the IIED claims).  Based upon Plaintiff's failure to defend or affirmatively pursue the claims, the Court deems the NIED claims abandoned. *Kovaco v. Rockbestos-Suprenant Cable Corp.*, 834 F.3d 128, 143 (2d Cir.

2016); *Rizzo–Puccio v. College Auxiliary Services, Inc.*, 216 F.3d 1073, 2000 WL 777955 (2d Cir. 2000); *Pajazetovic v. City of Utica, New York*, No. 6:18-CV-1496 (TJM/ATB), 2021 WL 4440473, at *6 (N.D.N.Y. Sept. 27, 2021); *Santana v. Racette*, No. 9:17-CV-00102 (BKS/ML), 2020 WL 3412728, at *8, n. 12 (N.D.N.Y. June 22, 2020).  Furthermore, for the reasons discussed by Miller in moving to dismiss the NIED claims, he has met his modest burden of  establishing his entitlement to summary judgment on these claims.[21]  Accordingly, Miller's motion in this regard is granted and the NIED claims alleged in the Fifth Cause of Action are dismissed.

## V.   CONCLUSION

For the reasons stated above, UCS's motion for summary judgment, ECF 163, is **GRANTED in part and DENIED in part**.  The motion is granted to the extent that Plaintiffs' Title VII claims against UCS arising from conduct occurring from January 2, 2015 until June or July 2017 when Plaintiffs and Miller were separated are **DISMISSED**. The motion is denied to the extent that Title VII claims against UCS arising from conduct occurring after Plaintiffs and Miller were separated in June or July 2017 may proceed.

Also for reasons stated above, Miller's motion for summary judgment, ECF 159, is **GRANTED in part and DENIED in part**. All claims against Defendant Miller are DISMISSED except for Plaintiffs' § 1983 equal protection claim brought against Defendant Miller in his individual capacity, which SURVIVES this Decision and Order.

---

[21] *See Hendricks*, 2013 WL 4106488, at *5 ("In this District, when a non-movant fails to oppose a legal argument asserted by a movant in support of a motion, the movant's burden with regard to that argument has been lightened such that, in order to succeed on that argument, the movant need only show that the argument possesses facial merit, which has appropriately been characterized as a "modest" burden. *See* N.D.N.Y. L.R. 7.1(b) (3) ("Where a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein...."); *Rusyniak v. Gensini*, 07–CV–0279, 2009 WL 3672105, at *1, n. 1 (N.D.N.Y. Oct. 30, 2009) (Suddaby, J.) (collecting cases); *Este–Green v. Astrue*, 09–CV–0722, 2009 WL 2473509, at *2 & n. 3 (N.D.N.Y.Aug.7, 2009) (Suddaby, J.) (collecting cases).

**IT IS SO ORDERED**.

Dated: March 7, 2024
        Syracuse, New York

Glenn T. Suddaby
U.S. District Judge